[No. B016671. Second Dist., Div. Five. July 16, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
ALVIN DEWITT THOMPSON, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Richard Lennon, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Geoffrey M. Huntting, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FEINERMAN, P. J.**—Following a jury trial, defendant, Alvin Dewitt Thompson, was convicted of one count of attempted murder (Pen. Code, §§ 664/187) and one count of assault with a firearm (Pen. Code, § 245, subd. (a)(2)). Allegations that he used a firearm within the meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1) were found to be true. The jury found him not guilty of a charge of mayhem and found an allegation that he had inflicted great bodily injury on his victim to be untrue.

Defendant was sentenced to a base term of seven years for the attempted murder, with a two-year enhancement for the use allegation, for a total of nine years. A three-year sentence, plus enhancement, on the assault count was stayed pursuant to Penal Code section 654. Defendant was also ordered to pay a $100 restitution fine. (Gov. Code, § 13967, subd. (a).) Defendant was credited with 423 days in custody, which included 141 days' conduct credit.

### FACTS

Charles Price (Price), the victim of the subject offenses, was a real estate agent who had been involved in a real estate transaction with defendant. A dispute arose between them over defendant's claim that Price owed him money. At about 4:45 p.m., May 2, 1984, defendant came to Price's house. When Price saw defendant, he became alarmed because defendant had repeatedly telephoned him, claiming that Price owed him money, had left a threatening message on Price's telephone answering machine, and Price had once observed defendant following him when he went to the bank. Price therefore armed himself with a gun, which he concealed in a towel, when he went to the door to speak to defendant. Price did not think the gun was visible to defendant.

Price told defendant that he did not have any money coming to him and asked defendant to leave. Defendant did not say anything. Price decided that he was not in any danger and that he had overreacted in arming himself. Price returned to his desk and left the gun there, wrapped in the towel. Price picked up a golf club with which he had been practicing chip shots prior to defendant's arrival and returned to the door. Defendant was still standing there. Price opened the screen door and walked onto the porch. Defendant backed up. Price continued walking toward defendant, carrying the golf club down at his side. Price did not attempt to hit defendant with the club.

Defendant did not say anything, but kept backing up until he reached his motorbike which was parked in Price's driveway. At that time, defendant

pulled a gun and fired at Price. Price turned and started to run. He was hit by one or more shots and fell face down in the street in front of an oncoming car. Defendant shot Price in the back of the neck while Price was lying on the ground. Price's right arm was partially paralyzed as a result of the shooting.

Patricia White (White) lived next door to Price. She was in her house at the time of the incident. She heard two male voices arguing, then heard three gun shots.[1] She ran to the door and saw Price lying in the street and defendant standing over him shooting. Defendant fired more than one shot while Price was on the ground.

White did not recognize defendant at the time because he was wearing a helmet. She discovered his identity later. White had known defendant for about seven years. Defendant telephoned her approximately four times after the shooting. The first time he called, he asked what White had seen. She told him that by the time she got to her door, Price was down and defendant was shooting. He told her to testify that she saw the victim's hand move. White informed him that she had not seen Price's hand move. Nonetheless, defendant continued to call her and ask her to testify that she had seen Price's hand move. White asked defendant why he had shot Price. Defendant said that it was because Price was trying to kill him with the golf club.

Victor Lerma (Lerma) testified that he was driving in the vicinity of Price's house on May 24, 1984. He first noticed Price walking rapidly down the street, following defendant. Price was carrying a golf club at his side. Lerma never saw Price raise the golf club in a threatening manner. Defendant pulled a gun and started shooting at Price. Price turned and ran. Defendant chased him and shot him in the back. Price fell in the street, about eight feet from Lerma's car. Lerma heard at least five shots.

Inglewood police officer, Russel Enyeart (Enyeart) interviewed defendant, after first advising him of his constitutional rights. Defendant told Enyeart that he shot Price in self-defense because he feared that Price was going to injure him with the golf club. On cross-examination, defense counsel asked Enyeart if he had asked defendant if he had seen Price with a gun. Enyeart replied, "I terminated the interview at that point."

Defendant testified in his own behalf that he had telephoned Price on the day of the shooting and threatened to report him to the Real Estate Commission, and that Price told him to come over to his house. When he got there, Price came to the door with a gun in his hand. Price said, "Let's

---

[1]White initially thought she was hearing firecrackers.

handle this right now." Price went to the side of the door, grabbed a golf club, came outside and swung the club at defendant. Defendant ran off the porch. Price chased him. Defendant thought Price had a gun in his waistband. Price was catching up with him. Defendant thought that Price was reaching toward his waistband. Price said, "You won't report shit to the real estate commission, I'm gonna kill you, you son of a bitch." Defendant was frightened. He shot Price because he feared for his life. He denied shooting Price after he was down on the ground.

On cross-examination, defendant admitted shooting at Price as Price was running away, but he claimed that he was in shock and just kept shooting until the gun was empty. Defendant also testified that Price pointed his arm at him as Price went down. Defendant further testified on cross-examination that he had told Enyeart that Price had tried to kill him with the golf club. When asked by the prosecutor if he had said anything to Enyeart about Price's gun, defendant replied, "I didn't get a chance to."

On rebuttal, Enyeart was recalled and testified that Price's gun was found in his house on his desk after the shooting. The only gun found in a search of the area adjacent to the shooting was defendant's weapon.

### DISCUSSION

Defendant asserts that after initially agreeing to waive his constitutional rights, and making the statement about being in fear of Price because of the golf club, he then invoked his right to remain silent and Enyeart terminated the interview.[2] He contends that the prosecutor, by asking him on cross-examination if he had said anything to Enyeart about Price's gun, violated the prohibition against commenting on a defendant's assertion of his constitutional right to remain silent. (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240].) Defendant also contends that further error occurred when, in closing argument, the prosecutor made the following statement: "In addition to that, Detective Enyeart asked him why he shot Mr. Price and he says [*sic*] because he threatened him with a golf club. [¶] And that is just not self-defense, ladies and gentlemen."

Defendant raised no objections below either to the prosecutor's cross-examination or to the quoted statement made in closing argument. Recog-

---

[2]Defendant made no record below of the circumstances surrounding his mid-interview assertion of his right to remain silent. However, during defendant's cross-examination of Enyeart on rebuttal, the prosecutor, outside the presence of the jury, informed the court that defendant had asserted his privilege against self-incrimination after making his initial statement, and that defense counsel's questions were leading toward that area. The prosecutor made clear that he had no objection to going into the subject if defendant wished to, but defense counsel withdrew his question and the subject was not broached further.

nizing that such failure to object would normally preclude appellate consideration of the issue, defendant argues that his counsel's failure to object deprived him of constitutionally adequate representation. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 581-582 [189 Cal.Rptr. 855, 659 P.2d 1144].) We disagree.

■ In *Doyle* v. *Ohio, supra,* 426 U.S. 610, the defendant immediately invoked his right to remain silent and made no post-arrest statement to police. Under those circumstances, the Supreme Court held that no comment could be made on defendant's assertion of his constitutional rights. *Doyle* v. *Ohio, supra,* is, of course, factually distinguishable from the case at bench. The present case is analogous to *People* v. *Farris* (1977) 66 Cal.App.3d 376 [136 Cal.Rptr. 45], in which the defendant also made an initial statement to police, but then asserted his right to an attorney when an officer attempted to get a written statement from him. Here, as in *Farris,* the key question is "whether the initial voluntary statements were of such nature as to open the door to the prosecution's cross-examination." (*People* v. *Farris, supra,* 66 Cal.App.3d 376, 390.) We emphatically conclude that they were.

The present case presents a new variation on a perennial theme: defendant would like to have his cake and eat it too. It appears that defense counsel below, knowing of the prosecution's inability to explain to the jury why Enyeart had terminated the interview, adroitly took advantage of *Doyle* v. *Ohio, supra,* 426 U.S. 610, and managed to convey the impression, through his cross-examination of Enyeart, that defendant had been precluded from telling the officer his full story because of Enyeart's abrupt termination of the interview. The limitations imposed on cross-examination by *Doyle* v. *Ohio, supra,* and scrupulously observed by the prosecutor, left the jury with much the same impression after the complained of cross-examination of defendant. Having effectively manipulated *Doyle* v. *Ohio, supra,* to his own advantage below, defendant would now like to repeat the performance on the appellate level.

The purpose of *Doyle* v. *Ohio, supra,* 426 U.S. 610, was to guarantee that a defendant would not be penalized for asserting the constitutional rights he is advised of upon arrest. It was not intended as a shield which would enable defendants to make exculpatory post-arrest statements and then insulate themselves from cross-examination about those statements by an expedient assertion of the right to remain silent.[3] ■■ Neither the

---

[3] It is worth noting that the United States Supreme Court was alert to and unwilling to countenance the potential for abuse inherent in *Doyle.* The Court observed: "It goes almost without saying that the fact of post-arrest silence could be used by the prosecution to contradict

prosecutor's cross-examination of defendant herein, nor the prosecutor's comment during closing argument, transgressed the area protected by *Doyle* v. *Ohio, supra;* and defense counsel's failure to object did not deny defendant adequate counsel.

The judgment is affirmed.

Ashby, J., and Eagleson, J., concurred.

A petition for a rehearing was denied August 5, 1986, and appellant's petition for review by the Supreme Court was denied October 15, 1986.

---

a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." (*Doyle* v. *Ohio, supra*, 426 U.S. 610, 619-620, fn. 11 [49 L.Ed.2d 91, 98].)