[No. A059084, First Dist., Div. Four. May 27, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
LUTHER EVANS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

William M. Robinson, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Laurence K. Sullivan and René A Chacón, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

POCHÉ, J.—*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] holds that once an arrestee chooses to remain silent after being admonished pursuant to *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the prosecution cannot use the fact of that silence to impeach an exculpatory story told for the first time at trial. The primary issue presented is whether *Doyle* is violated when a single question is posed and a defense objection thereto is overruled. We hold that in such circumstances a *Doyle* violation has occurred.

### BACKGROUND

Ms. X. testified that in the early morning hours of October 20, 1991, she was alone and asleep in her apartment when she was awakened by a hand over her mouth and a voice telling her not to scream. She found a man on top of her, telling her to spread her legs. The man got "astride" her, fondled her breast, and touched her vaginal area. The man demanded oral copulation or sexual intercourse. Hoping to "get him off his guard," Ms. X. agreed to orally copulate the man. He produced a condom and ordered Ms. X. to put the condom on him. After she did so, the man checked to see that the door was locked. When he returned Ms. X. jumped up and escaped into the hall, pounding on the walls and screaming.

After Ms. X. was admitted to an apartment one floor up from her own, police were summoned. Ms. X. gave a telephone description of the man and his clothes. Police arrived at the scene while she was still speaking with the 911 operator. No more than seven minutes after escaping, Ms. X. was shown defendant Luther Evans, whom she instantly identified as her attacker. When in her apartment with Officer Ng, he found on the floor of her closet a "key chain coin purse type of thing," which she told him was not hers. Asked by Officer Ng if a slip had been taken from her apartment, Ms. X. checked and found one missing from a rack inside her closet. While at the hospital she was shown a slip which she identified as hers.

After hearing the screams, the building's assistant manager called 911, dressed, and went to the front door of the building. He saw defendant and two other men just outside the building's front door. Defendant stated that "there had been a rape or attempted rape and that the suspect had run away." While pointing out the direction the "suspect" had fled, defendant was holding up his pants with one hand. The assistant manager saw no one in the direction indicated by defendant.[1] Defendant entered the building, went directly to the victim's apartment (which cannot be seen from the front door),[2] and stated that "this is where it happened," and entered through the closed door without knocking. The assistant manager described defendant as "highly animated," and "babbling," a "whirling dervish" who was "sweating profusely."

When the building manager arrived on the scene he saw defendant "scurrying around picking up clothing off the floor . . . as if he were looking for something" in the hallway near Ms. X.'s apartment. Carrying an armful of clothing, and repeatedly telling the manager "she asked me to help her," defendant went into Ms. X.'s apartment. The manager followed and saw defendant roam around "as if he were looking for something," particularly on the floor and near the bed. The manager ordered defendant out of the apartment. Still carrying the armful of clothing, defendant left and rejoined the two men outside the building. Defendant emerged from the building just as Officer Stewart Ng arrived on the scene.[3]

Officer Ng testified that he promptly detained defendant after arriving at the scene and noting that defendant and his clothing were "very close" to the radio description of the assailant. Ng characterized defendant's appearance as "disheveled," which he described as follows: "The belt was undone . . . unbuckled, dangling. The pants were only held by the clasp and the zipper was down . . . with the shirt tail hanging out the zipper part. The shirt tail in the back hanging out." Ng conducted a patsearch of defendant and found (among other things) two screwdrivers and a knife. Leaving defendant with the just-arrived Officer Yick, Ng met with Ms. X., and asked her to look at

---

[1] It seems virtually certain that the two other men seen near the front of the building were a Mr. Harmon and a Mr. Ilse. Mr. Harmon did not appear at the trial, but Mr. Ilse did. He testified in effect that defendant was the only other person in the vicinity before police arrived at the scene.

[2] Ms. X. testified that her apartment is on what seems to be a sort of mezzanine level, and is reached by going through the lobby, up a short flight of stairs, and turning down a hallway. According to its occupant, the apartment is not visible from either the street or the lobby. The assistant manager of the building agreed that the apartment cannot be seen from "the public area."

[3] The manager noted that the building's front door had a recent "gouge mark . . . right by the lock as if somebody had chewed away at the wood to get to the lock." Officer Ng testified to seeing "fresh pry marks on the door."

defendant. After she did so, and identified defendant ("Oh my God, that's him"), defendant was arrested and taken to a police station. During the course of speaking with Ms. X. in her apartment, Ng noticed a coin purse on the floor. Ms. X. told Ng it was not hers.

Officer Ng then went to the station. After receiving *Miranda* admonishments from Officer McKay, defendant invoked his right to remain silent. While being booked defendant asked Ng where his wallet was. As defendant was—at Ng's request—describing the wallet and its contents, Ng realized defendant might be referring to the coin purse found in the victim's apartment. Ng confirmed that defendant had accurately described the contents of that coin purse. Ng showed it to defendant and asked if it belonged to him. Defendant replied that it did.

Officer Patrick Yick testified that he continued the search begun by Officer Ng just after defendant was detained. Among other items found was the slip Ms. X. later identified as hers; Yick discovered the slip "stuffed in his [defendant's] pocket." Later that morning, as Yick was escorting defendant to the police station, an unrolled condom fell out of the inside leg of defendant's trousers. Yick searched defendant and found an opened condom package in one of defendant's pants pockets.

Defendant's version of events was that he was collecting cans outside the apartment building when he heard a woman screaming "Rape." Defendant met the assistant manager, walked into the building and into a hallway, where he began picking up clothing strewn on the floor. After the manager ordered him out, defendant left and set the clothes he was carrying down outside the building's entrance. Just then police arrived. Officer Ng grabbed defendant, searched him and removed his change purse, which was taken into the building by police. Defendant was then marched into the building, shown to the victim, and taken to the police station. Once there, Yick did not see an unrolled condom fall out of defendant's pants leg; Yick did, however, take from defendant an unrolled condom still in its package. Defendant denied telling the assistant manager that he had seen a man running down the street. He denied holding up unbuckled pants while doing so. Defendant denied ever being in Ms. X.'s apartment with her. Defendant was impeached with five prior felony convictions, two for rape, and one each for robbery, burglary, and assault with intent to commit rape.

The jury found defendant guilty as charged of committing first degree burglary (Pen. Code, § 459), assault with intent to commit rape (Pen. Code, § 220), assault with intent to commit oral copulation (*Ibid.*), and sexual battery (Pen. Code, § 243.4). After finding true two of the five prior serious

felony allegations, the trial court sentenced him to state prison for a total term of twelve years. Defendant perfected a timely appeal from the judgment.

REVIEW

I

The final portion of defendant's testimony on direct examination concerned his being advised of *Miranda* by Officer McKay, invoking his right to silence, and then being booked by Officer Ng:

"Q. Did you see Officer McKay?

"A. Yes, I did.

"Q. Where did you see Officer McKay?

"A. She came into the station without talking to me at all, and said, 'I am going out to my car and get my tape recorder.' I guess she assumed I was going to give her a statement.

"Q. Did anything happen?

"A. She went out to her car and came back with a tape recorder.

"Q. When she came back with the tape recorder did anything occur?

"A. She read me my *Miranda* rights.

"Q. Were those the rights she testified to this morning?

"A. That is correct, yes.

"Q. After she read you those rights, what happened?

"A. I said I didn't want to talk to her.

"Q. And did anything occur after that?

"A. I asked her what I was being charged with.

"Q. Did she respond?

"A. Well, she was kind of angry. She told me to ask the booking officer. [¶] She got up and walked away, and told me to ask the booking officers.

"Q. Did anything occur after that?

"A. She left, and I did ask—I inquired of Ning [*sic*] what I was being booked for, and he said he didn't—he hadn't figured it out . . . .

"Q. Did anything happen after that?

"A. No.

"[DEFENSE COUNSEL]: I have no further questions."

The prosecutor then commenced her cross-examination:

"Q. You say Officer McKay was angry with you and she didn't want to talk to you?

"A. I didn't say that.

"Q. You said she was angry?

"A. I said she appeared to be angry, yes, after I refused to talk to her.

"Q. Now, you knew you did nothing wrong?

"A. That's correct.

"Q. Is that true?

"A. That's correct.

"Q. And you didn't want to tell Officer McKay when given the opportunity to tell her—

"[DEFENSE COUNSEL]: Your Honor—

"THE WITNESS: Let me—

"[DEFENSE COUNSEL]: May we approach the bench?

"THE COURT: No.

"[DEFENSE COUNSEL]: I am going to make an objection, Your Honor, as to the district attorney attempting at this time to question why the defendant exercised his *Miranda* rights."

"THE COURT: Are you suggesting that she can't ask that after he [defendant] has taken the stand.

"[DEFENSE COUNSEL]: Well, yes, I mean—

"THE COURT: Do you have any authority for your position?

"[DEFENSE COUNSEL]: No, Your Honor.

"THE COURT: Overruled.[4]

"Q. When the officers had you in custody initially did you say anything to them that you did nothing wrong?

"A. Yes, I did say that." The prosecutor then moved on to other matters. **(1a)** Defendant contends these events demonstrate a violation of *Doyle* v. *Ohio, supra,* 426 U.S. 610.

*Doyle* holds that the prosecution violates due process if it uses the postarrest silence of a suspect who was given *Miranda* warnings to impeach an exculpatory explanation subsequently offered at trial. The Supreme Court has explained the rationale of this holding in these terms: "[The] use of silence for impeachment [is] fundamentally unfair . . . because '*Miranda* warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances.' " (*Fletcher* v. *Weir* (1982) 455 U.S. 603, 606 [71 L.Ed.2d 490, 493-494, 102 S.Ct. 1309].)

Whether *Doyle* error occurred must be considered in light of *Greer* v. *Miller* (1987) 483 U.S. 756, 763 [97 L.Ed.2d 618, 628-629, 107 S.Ct. 3102] (*Greer*), the most recent treatment of *Doyle* by the United States Supreme Court. After presenting exculpatory testimony, the defendant in *Greer* was asked by the prosecution "Why didn't you tell this story to anybody when you got arrested?" The court detailed what happened thereafter: "Defense counsel immediately objected. Out of the hearing of the jury, Miller's lawyer requested a mistrial on the ground that the prosecutor's question violated Miller's right to remain silent after arrest. The trial judge denied the motion, but immediately sustained the objection and instructed the jury to 'ignore [the] question, for the time being.' . . . The prosecutor did not pursue the issue further, nor did he mention it during his closing

---

[4]At a discussion in chambers shortly thereafter defense counsel identified the authority for his objection as defendant's constitutional "right to remain silent."

argument. At the conclusion of the presentation of evidence, defense counsel did not renew his objection or request an instruction concerning the prosecutor's question. Moreover, the judge specifically instructed the jury to 'disregard questions . . . to which objections were sustained.' " (*Greer*, at p. 759 [97 L.Ed.2d at p. 626] [citation omitted].)[5] The defendant was found guilty, but his conviction was set aside because of *Doyle* error. (*Id.* at pp. 759-760 [97 L.Ed.2d at pp. 626-627].)

The Supreme Court reversed. ▉ In reaching its conclusion that "no *Doyle* violation occurred in this case" (*Greer, supra,* 483 U.S. at p. 765 [97 L.Ed.2d at p. 630]), the court explained that a *Doyle* violation has two components, both of which must exist. The first element is that the prosecution makes *use* of a defendant's postarrest silence for impeachment purposes. Use of a defendant's postarrest silence can occur either by questioning or by reference in closing argument.[6] The second essential element is that the trial court *permits* that use. (*Greer, supra,* at pp. 761-764 [97 L.Ed.2d at pp. 627-630].) The type of permission specified in *Greer* will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate.

▉ *Greer* involved the situation in which ". . . the prosecutor attempted to violate the rule of *Doyle* by asking an improper question in the presence of the jury." (*Greer, supra,* 483 U.S. at p. 765 [97 L.Ed.2d at p. 630].) The prosecution put "an improper question" (*ibid.*), but the actions of the trial court there denied the prosecution permission to use the defendant's postarrest silence. The situation in the case at hand is essentially the converse of *Greer*: the prosecutor asked a question whose clear substance concerned why defendant had not given an exculpatory response to Officer McKay "when given the opportunity"—i.e., when defendant had his sole meeting with McKay at the station following his arrest, the meeting at which defendant received *Miranda* warnings.

By overruling the defense objection, the trial court clearly gave its approval to the prosecutor's improper inquiry and as much as told the jury that

---

[5]The *Greer* court treated the defense objection as sufficient to preserve the issue for appeal. Given that defense counsel here made his objection on the same "right to remain silent" basis (see fn. 4, *ante*), we disagree with the Attorney General's claim that defendant's *Doyle* argument is not properly before us.

[6]Accordingly, depending on the context, the use can be attacked as evidentiary error, prosecutorial misconduct, or—as occurred in *Greer*—both. (See *Greer, supra,* 483 U.S. at pp. 764-766 [97 L.Ed.2d at pp. 629-631]; *People v. Galloway* (1979) 100 Cal.App.3d 551, 556-562 [160 Cal.Rptr. 914].) If these claims have not been preserved for appeal, the use can still be attacked as attorney incompetence. (See *People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1518-1522 [275 Cal.Rptr. 810]; *People v. Thompson* (1986) 183 Cal.App.3d 437, 441-443 [228 Cal.Rptr. 304].)

the subject of the prosecutor's question was legitimate. There can be no possible doubt that this satisfied the permission element required by *Greer*. We therefore hold in accordance with *Greer* that the improper questioning by the prosecutor coupled with validation of such questioning by the trial court constituted a violation of *Doyle* v. *Ohio*.

■ The Attorney General argues that after the objection was overruled "the prosecutor then moved on to a different subject" which he understands to be "the defendant's pre-*Miranda* statements to detaining officers." From this we are urged to find that "no *Doyle* error is demonstrated."

We find it next to impossible to read the record (reproduced above) in the fashion the Attorney General suggests. The entire thrust of the questioning is aimed at the post-*Miranda* questioning by the police. We construe the question which the prosecutor asked immediately after the trial court erroneously overruled the objection to be a question aimed at the same impermissible area of post-*Miranda* silence. But even if the questioning can be read in the manner suggested by the Attorney General, it is irrelevant that the defendant did not answer the first offending question about the reason the defendant "didn't want to tell Officer McKay when given the opportunity to tell her . . . ." It is not a defendant's answer that makes out the first element of a *Doyle* violation but the activity of a prosecutor in calling attention to a defendant's post-*Miranda* silence, whether the prosecutor does this by questioning or argument. In *Doyle* the Supreme Court drove this home by noting " '. . . it does not comport with due process to permit the prosecution during the trial *to call attention to* [the defendant's silence].' " (*Doyle* v. *Ohio*, *supra*, 426 U.S. at p. 619 [49 L.Ed.2d at p. 98] [quoting *United States* v. *Hale* (1975) 422 U.S. 171, 182-183 [45 L.Ed.2d 99, 108, 95 S.Ct. 2133] (White, J. conc. in judg.), italics added].)

■ ■ The separate concurrence makes two points: (1) *Doyle* is inapplicable where it is the defendant who first raises the issue of his choice to remain silent after receiving *Miranda* warnings, and (2) the single, unanswered question posed by the prosecution does not constitute a *Doyle* violation because no *evidence* went before the jury.

■ The first point is essentially that defendant waived his *Doyle* protection. The problem is that ". . . the Supreme Court has never applied the waiver doctrine to a *Doyle* violation." (*Bass* v. *Nix* (8th Cir. 1990) 909 F.2d 297, 304.) The only qualification to *Doyle* is that it will permit a defendant who presents exculpatory testimony at trial to be questioned about a post-*Miranda* statement if that statement is inconsistent with the version unveiled at trial. (*Anderson* v. *Charles* (1980) 447 U.S. 404, 408 [65 L.Ed.2d

222, 226-227, 100 S.Ct. 2180].) In this case, because defendant made no statement after receiving *Miranda* warnings, there was no inconsistency with his trial testimony. The obvious and only purpose to the prosecutor's questions was to reveal the prohibited fact of defendant's having refused to make such a statement because he had invoked his constitutional right to remain silent. (See, e.g., *U.S.* v. *Laury* (5th Cir. 1993) 985 F.2d 1293, 1303; *U.S.* v. *Canterbury* (10th Cir. 1993) 985 F.2d 483, 486.)

The second point is essentially that a *Doyle* violation requires evidence at trial and cannot exist without an express testimonial basis. This is not how the Supreme Court views the matter: "[I]n each of the cases in which this Court has applied *Doyle*, the trial court has permitted specific *inquiry or argument* respecting the defendant's post-*Miranda* silence. See . . . *Wainwright* v. *Greenfield* [(1986) 474 U.S. 284 (88 L.Ed.2d 623, 106 S.Ct. 634)] *(closing argument).*" (*Greer, supra,* 483 U.S. at p. 764 [97 L.Ed.2d at pp. 629-630] [italics added].) Neither "inquiry" nor "argument" requires an evidentiary platform; both can make do with inference or innuendo. California and federal courts have long accepted that *Doyle* can be violated by "*a mere reference*" (*People* v. *Galloway, supra,* 100 Cal.App.3d 551 at p. 561 [original italics]) or "virtually any description of a defendant's silence following arrest and a *Miranda* warning." (*United States* v. *Shaw* (5th Cir. 1983) 701 F.2d 367, 382.) The prosecutor here clearly met these criteria. No authority has been cited or found for the proposition that *Doyle* is inoperative so long as there is no direct evidence of an accused's post-*Miranda* silence.

The next question is whether the error can be treated as harmless beyond a reasonable doubt. In the circumstances of this case, where the trial record shows an exceptionally persuasive prosecution case confronting an exceptionally feeble showing by the defense, it can.

The prosecution had the victim's at-the-scene and in-court identifications of defendant, neither of which was ever shaken. Defendant is first seen telling the building's assistant manager the direction the "suspect" was running. Yet neither the assistant manager nor the only bystanders (see fn. 1, *ante*) saw any running figure. More significantly, the testimony of one of those bystanders—who had been on the street near the front of the apartment building for an appreciable period, seeing no one other than defendant— casts considerable doubt on whether such a fleeing suspect ever existed. The strength of the rest of the prosecution's case makes it virtually certain that there was not. There is also the uncontradicted evidence of defendant claiming that the victim "asked me to help her," a patently untrue effort to allay suspicion and justify rummaging through the victim's apartment. Defendant's obviously false statements designed to evade detection and shift suspicion away from him show a consciousness of guilt. Furthermore, defendant's

unsuccessful attempt to retrieve his wallet/coin purse and thereby conceal incriminating evidence is similarly indicative of his consciousness of guilt.

Defendant's position at trial was that he was innocently collecting cans. Yet when first seen by the assistant manager, and later by Officer Ng, defendant had no cans with him, was in a highly agitated emotional state, was sweating "profusely" as if he had just done some running, and was wearing clothing in a state of disarray highly suggestive of a recent hurried departure. It is conceivable that one may wander the streets collecting cans at 4:30 in the morning, but a claim to be doing so in front of a rape scene with one's trousers all but falling down strains credulity. Proof of defendant's five prior convictions would damage his credibility still further.

The door to the building was jimmied and defendant was found in possession of instruments capable of achieving that result. That defendant's entry into the apartment building was a forced entry is irrelevant; all that is required is proof that he entered Ms. X.'s apartment with felonious intent. (See Pen. Code, § 459 ["Every person who enters any . . . apartment . . . with intent to commit . . . any felony is guilty of burglary"]; *People* v. *O'Keefe* (1990) 222 Cal.App.3d 517, 520-521 [271 Cal.Rptr. 769].) Ms. X. testified that her door was shut but not locked prior to the intruder's entry. Nevertheless, evidence of the tools found on defendant helps get him to Ms. X.'s apartment, aligns with the damage to the front door (see fn. 3, *ante*), and, by being odd implements for a collector of cans on the street to carry, further impeaches defendant's version of his presence.

Defendant claimed never to have been in the victim's apartment, yet upon entering the building he went straight to that apartment, which cannot be seen from the street (see fn. 2, *ante*), and identified it as "where it happened." Defendant marched right into the apartment, apparently knowing that although the door was shut it was not locked. Prior knowledge is the only explanation for this confidence.

Picking up clothes, poking through the apartment, yet never going near the victim—the natural object of human concern—are hardly the actions of a good Samaritan. They are, however, easily understood as the actions of a man who is both anxious to avoid the chance of being identified by the victim, and is desperately trying to retrieve a lost item that conclusively ties him to the crimes. His interest in that item—the wallet/coin purse found in the victim's apartment—is so great that defendant not only lets the manager see him hunting for something on the floor in and around the victim's apartment but he continues to seek that item even while being booked at a

police station. No reasonable jury could fail to see defendant's actions in a very unfavorable light.[7]

And why would defendant, if innocent, take the victim's slip and stuff it into his trouser pocket, where it was discovered by Officer Yick?

One other point deserves special mention. The victim testified that she placed a condom on defendant just before she escaped. At the police station an unrolled condom fell out of his trouser legs.

The very brief time span involved for the entire incident, the even briefer period during which defendant was unobserved, and defendant's words and conduct once the victim raised the alarm lead inevitably to the conclusion that defendant's behavior and disheveled state of dress can only be explained by what defendant had done in the victim's apartment prior to her escape. The web of incriminating circumstances spun by the prosecution was exceptionally tight and strong. Finally, at no time in her closing arguments did the prosecutor make the slightest reference to defendant's postarrest silence.

We believe that any rational jury would credit the prosecution's case, reject defendant's theory of police-fabricated evidence, and conclude that defendant was guilty as charged. A careful examination of the entire record convinces us that the error does not require reversal according to the standard of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment of conviction is affirmed.

Perley, J., concurred.

**ANDERSON, P. J.**—I concur with my colleagues' affirmance of the judgment entered against the defendant. However, I disagree with their rationale. In my view, the fact that the defendant first introduced evidence concerning his choice not to speak to the police after being informed of his *Miranda*

[7]In part II of this opinion, *post*, we conclude that evidence of defendant claiming the wallet/coin purse displayed at the police station by Officer Ng should have been excluded as elicited by improper custodial interrogation in violation of *Miranda*. Nevertheless, the elimination of evidence that defendant expressly claimed the wallet as his own would have only a minimal effect on the prosecution's ability to tie defendant to the wallet.

*See footnote, *ante*, page 358.

(*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) rights makes a *Doyle* (*Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]) analysis unnecessary. Moreover, even if *Doyle* were relevant to our inquiry, I do not believe that the facts of this case constitute a *Doyle* violation.

In *Doyle*, two defendants (Doyle and Wood) were convicted in separate state trials of selling marijuana to an informant. At their trials, Doyle and Wood had told "not entirely implausible" exculpatory stories, and little "direct evidence" was introduced to contradict them. (*Doyle* v. *Ohio, supra,* 426 U.S. at p. 613 [49 L.Ed.2d at p. 95].) The prosecutor was permitted, over repeated defense objections, to ask whether or not Doyle and Wood told their stories to the arresting agent (Beamer) when they were arrested. (*Id.,* at pp. 613-615 [49 L.Ed.2d at pp. 95-96].)

The Supreme Court determined that the prosecutor's use "for impeachment purposes" of the defendants' silence—after receiving *Miranda* warnings—constituted a violation of the due process clause of the Fourteenth Amendment. (*Doyle* v. *Ohio, supra,* 426 U.S. at p. 619 [49 L.Ed.2d at p. 95].) However, the rationale for the court's decision (italicized in the majority opinion) is the key to understanding its potential application to the case at hand: " '. . . it does not comport with due process to permit *the prosecution* during the trial *to call attention to* [the defendant's silence] . . . .' " (*Ibid.,* italics added.)

The policy underlying *Doyle*—protecting a defendant from improper prosecutorial use of his choice to remain silent after being given *Miranda* warnings—does not apply when a defendant *voluntarily chooses* to introduce his decision to remain silent as part of his *defense*.[1] Once the defendant made that choice, his postarrest silence became a legitimate subject for cross-examination. Put another way, the defendant's choice eliminated due process concerns.

Furthermore, the *single, unanswered question* posed by the prosecution does not constitute a *Doyle* violation. In my view, my colleagues misread *Greer* v. *Miller* (1987) 483 U.S. 756 [97 L.Ed.2d 618, 107 S.Ct. 3102]. Although they correctly report the facts and the ultimate decision in *Greer,* they overlook how the court reached its conclusion: "The *fact* of [defendant's] postarrest silence was not submitted to the jury as *evidence* from which it was allowed to draw any permissible inference, and thus no *Doyle* violation occurred . . . ." (*Id.,* at pp. 764-765 [97 L.Ed.2d at pp. 629-630], italics added.)

---

[1] In the case at hand, not only did defendant testify about his remaining silent, the *defense* called Officer McKay to establish the same fact.

Putting aside the fact that the defendant introduced the fact of his silence, thus inviting whatever inferences the jury might draw from it, it is clear that the prosecutor's single, unanswered question did *not* serve as *evidence* of that silence.[2] The jurors were clearly instructed that questions do not constitute evidence. In addition, they were instructed that they were not to assume to be true "any insinuation suggested by a question."[3]

In sum, any inferences that might have been drawn by the jury from the defendant's silence were inferences *he* chose to permit them to draw. Once he introduced evidence of his silence, the prosecution had every right to cross-examine thereon.

Respondent's petition for review by the Supreme Court was denied August 17, 1994.

---

[2]Contrary to my colleagues' view, it is absolutely clear that the prosecutor's follow-up question about the defendant's pre-*Miranda*-warnings statements was proper. Even if the question had addressed pre-*Miranda*-warnings *silence* on the part of the defendant, it would have been proper. (*Fletcher* v. *Weir* (1982) 455 U.S. 603, 607 [71 L.Ed.2d 490, 494, 102 S.Ct. 1309].)

[3]It is worth noting that the prosecutor did not argue that the defendant's postarrest silence was relevant to the jury's decisionmaking process. In fact, the defendant's silence was never mentioned by the prosecutor in her closing argument.