Filed 1/9/15  P. v. Tobar CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO JUNIOR TOBAR,<br><br>　　　　Defendant and Appellant. | A138051<br><br>(Contra Costa County<br>Super. Ct. No. 51216753) |

**I.**

**INTRODUCTION**

Appellant Alfredo Junior Tobar was convicted of assault with a deadly weapon and assault with force likely to produce great bodily injury against a single victim.  He claims on appeal that his silence after being given *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)) improperly was used to prove his guilt at trial.  He also contends that his Fifth and Fourteenth Amendment rights were further violated by: (1) the trial court instructing the jury that it could consider his post-*Miranda* silence in response to questions posed by the interrogator as adoptive admissions, (2) the use of an adoptive admission jury instruction that was incomplete, and (3) the prosecutor commenting on his silence during closing arguments.

We reject these contentions and affirm the judgment.

## II.
## STATEMENT OF FACTS

### A. The Prosecution's Case

On July 21, 2012, appellant lived in the basement of the home of Johnny Ramos and his girlfriend, Carissa Trolesi, in Oakley. On that date, David Castellanos arrived at Ramos's door asking for the return of his chainsaw. Appellant then called Ruben Ortiz on the phone and told him to come over to Ramos's house because Castellanos wanted his chainsaw back. Trolesi overheard appellant tell Ortiz "he was going to serve him [Castellanos] something like David [Castellanos] did, Kip. And he better not cry." Castellanos was outside with Ramos when the telephone conversation occurred.

Ortiz arrived about 15 minutes later, carrying a knife in his tool belt. However, he left the tool belt and the knife in his truck. Shortly after he arrived, he and Castellanos got into a fistfight. Trolesi testified that Ortiz looked "all pumped up" and ready for a fight, but Castellanos got Ortiz into a headlock and Ortiz could not get free. Despite this observation, it appeared to Trolesi that Castellanos was the one who needed help in the fight.

Appellant came out of the house with a five-inch fishing knife in his waistband. He walked up to the struggling men and stabbed Castellanos with an underhand motion. According to Trolesi, by the end of the fight appellant was on top of Castellanos, and Castellanos was on the ground struggling to get up. As appellant stabbed Castellanos, he said, "That's what you get for talking shit," and "You want some more?"

Trolesi went outside and turned the garden hose on the men to break up the fight. When the fight was over, Ortiz and appellant hopped into Ortiz's truck and took off.

Ramos loaded Castellanos into a car and drove him to the Sutter Delta Hospital in Antioch. Doctors at the hospital discovered Castellanos had been stabbed in the back seven times. Both of his lungs collapsed as a result, and his injuries were considered potentially fatal. Castellanos was flown to the trauma center at John Muir Medical Center in Walnut Creek, where he received further treatment and survived the attack.

Although police tried to interview Castellanos at the hospital, he lapsed into and out of consciousness and provided them with no information. Police found his bloody clothes, seized them, and searched them as they were booked into evidence. They found no identification, drugs or weapons among Castellanos's possessions. A blood test showed Castellanos had methamphetamine, amphetamines, cocaine, PCP, and THC in his system.

Potential witnesses located at Ramos's house were uncooperative in responding to police questioning. Trolesi, too, was evasive and unwilling to talk in the presence of others. However, the investigating officer later ran into Trolesi at a bus stop when there was no one else around, and she told him she had seen Castellanos and Ortiz fighting in the street on the day in question. She told him appellant then walked up and stabbed Castellanos. It did not look to her like Ortiz was losing the fight. A warrant was issued for appellant's arrest, and he was arrested at a friend's house (Chester Hensley) a few days later.

### B. The Defense Case

Appellant did not testify but presented a defense of others theory through the testimony of Melissa Acevedo, Ortiz's girlfriend. Acevedo testified she rode with Ortiz to Ramos's house on the date of the attack. As they drove up, Castellanos was pacing on the sidewalk, "ranting and raving, screaming a bunch of words" toward Ramos's house. Ortiz told Acevedo to stay in the truck and lock the doors.

Ortiz walked around the back of the truck and asked Castellanos what was going on. Castellanos took a swing at Ortiz, and Ortiz ducked. As Ortiz backed away, Castellanos threw another punch, this one connecting. The two men began hitting each other as the fight moved from the sidewalk to the street and then closer to Ramos's property.

In the middle of the fight, Ortiz slipped and Castellanos got him into a headlock. As Ortiz tried to get out of the headlock, he was struggling to breathe and started turning

3

blue.[1]  "He was moving around like a fish flopping around."  Ortiz's movements slowed and his eyes rolled back in his head.  With Ortiz in a headlock, Castellanos repeatedly hit him in the face.  Acevedo rolled the window down and yelled for help.

People started coming out of Ramos's house, and a young lady turned a water hose on the men to break them up.  This was before appellant ever stepped into the fight.  Acevedo saw appellant come out of the house, yelling "over and over" at Castellanos to let go of Ortiz.  Castellanos just got a tighter grip, and Ortiz was getting whiter and whiter, looking like he had passed out.  Acevedo then saw appellant hit Castellanos in the back and ribs four or five times.  Acevedo did not see a knife in appellant's hand.  According to Acevedo, Castellanos started the fight, and was beating up Ortiz before appellant came out and saved Ortiz.  It appeared to Acevedo that if appellant had not taken action, Ortiz could have been killed.

When Castellanos released Ortiz from the headlock, Ortiz fell to the ground and nearly lost consciousness.  Ortiz could not stand by himself, so appellant helped him into the truck.  The three started the truck and left.  Acevedo and appellant did not take Ortiz to the hospital.

Neither Castellanos nor Ortiz nor Ramos testified.

### III.

### PROCEDURAL HISTORY

By amended information filed December 10, 2012, appellant was charged with attempted murder (Pen. Code, §§ 187, 664)[2], assault with a deadly weapon (knife) (§ 245, subd. (a)(1)), and assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)), together with personal weapon use allegations (on counts one and three) and great bodily injury enhancements (on all counts) (§§ 12022, subd. (b)(1), 12022.7, subd. (a)).  Castellanos was named as the victim in each count.

---

[1] Trolesi did not see Castellanos strangle Ortiz and did not see Ortiz turn blue.

[2] Statutory designations, unless otherwise indicated, are to the Penal Code.

4

Prior to trial, appellant filed written in limine motions, including a motion to exclude statements made during interrogation after his arrest on grounds that his *Miranda* rights had been violated.  The court held a hearing under Evidence Code section 402, which consisted of watching the DVD of the interrogation  and hearing the arguments of counsel.  The court ruled that appellant had waived his *Miranda* rights and his statements were admissible.  The details of the interrogation will be discussed below.

After deliberating for approximately four hours over two days before reaching its verdicts the jury acquitted appellant of attempted murder but found him guilty on counts two and three, also finding true the alleged enhancements on those counts.  Appellant was sentenced to an aggregate term of eight years in prison.

## IV.

## DISCUSSION

Appellant's issues on appeal revolve around his post-arrest interrogation by Contra Costa County Sheriff's Detective George Koutsoubos.  Relying upon *Doyle v Ohio* (1976) 426 U.S. 610 (*Doyle*), appellant contends referencing his post-*Miranda* silence during that interrogation was inadmissible.  Alternatively, he asserts that even if this evidence was properly admitted, the court's instruction allowing the jury to treat his silence as an adoptive admission violated his Fifth and Fourteenth Amendment rights.  As to this instruction (CALCRIM No. 357), appellant claims further that it erroneously removed from the jury's consideration whether he, in fact, invoked his Fifth Amendment privilege during the interrogation, which would have rendered the adoptive admission rule inoperative.  Lastly, he contends that the prosecutor's comments on his silence during closing arguments further violated his due process right.

### A.  Appellant's Claims of *Doyle* Error

#### 1.  Pretrial motion based on **Miranda v. Arizona**

*Miranda*, *supra*, 384 U.S. 436, of course, requires law enforcement officers as a prophylactic measure to advise arrestees of their rights under the Fifth Amendment before questioning them.  (*Id*. at pp. 467-474.)  "[I]f the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."

5

(*Id.* at pp. 444–445.) At the hearing on appellant's *Miranda* motion, defense counsel conceded appellant had been given a proper advisement at the beginning of the interview with Koutsoubos.

After advising appellant of his rights, Koutsoubos did not ask whether appellant understood these rights, and no express verbal or written waiver was taken. But, after being advised of his *Miranda* rights, appellant voluntarily responded to several of Koutsoubos's initial questions. For instance, appellant referred to the victim as a "bully" in responding to Koutsoubos's question about "what happened with David." When appellant was told he was charged with attempted homicide he asked, "Why is it attempted homicide?" Koutsoubos explained that Castellanos's injuries were so severe that he could have "bl[ed] out" from a punctured lung.

The interrogation largely proceeded with Koutsoubos posing hypothetical circumstances that he suggested might justify the stabbing. Through the course of the interview, appellant answered a few questions[3] but mostly maintained silence. Though he frequently declined to answer the detective's questions, appellant never asked to stop the questioning and never asked for a lawyer.

In determining whether *Miranda* rights have been waived, an express statement by an accused that he understands his *Miranda* rights is not required, nor is an express waiver. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 383-384 (*Thompkins*); *North Carolina v. Butler* (1979) 441 U.S. 369, 373.) Rather, the test is whether, under the totality of the circumstances, a waiver may be inferred by a preponderance of the evidence. (*People v. Duff* (2014) 58 Cal.4th 527, 553; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219 (*Sauceda-Contreras*).)

"If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. [Citation.]" (*Thompkins*, *supra*, 560 U.S. at p. 384.)

---

[3] For instance, when Koutsoubos accused appellant of hiding out at Hensley's house where he was arrested, appellant said he was not hiding.

Instead, "[t]he prosecution must make the additional showing that the accused understood these rights. [Citations.]" (*Ibid.*) But, "a defendant's decision to answer questions after indicating that he or she understands the *Miranda* rights may support a finding of implied waiver, under the totality of the circumstances. [Citation.]" (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1269; see also *People v. Hawthorne* (2009) 46 Cal.4th 67, 86.)

In this case the court found that by nodding his head slightly during the *Miranda* advisement, appellant signaled that he understood his rights. The trial court found appellant's nodding movements were "[not] prominent" but were "noticeable movements of the head up and down." It ruled that appellant had impliedly waived his Fifth Amendment privilege by continuing the dialogue with Koutsoubos thereafter, selectively answering subsequent questions posed.

The court also had evidence before it that appellant had previously been Mirandized in 1993, but it placed little reliance on that evidence. The court commented that appellant seemed alert, seemed to be listening to Koutsoubos, and "[t]here was some exchange later, after the advisement." It found this a sufficient showing that appellant understood his rights and waived them, meeting the preponderance standard.

On appeal, we review independently the trial court's legal determinations of whether a defendant's statements were voluntary, and whether his *Miranda* waivers were knowingly, intelligently and voluntarily made. (*People v. Rundle* (2008) 43 Cal.4th 76, 115.) We have reviewed the recording of Koutsoubos's interview of appellant, and we agree with the trial court's assessment that appellant was attentive during the *Miranda* recitation, and appeared to nod his head, albeit slightly, indicating an understanding of what he was being told. Under the totality of circumstances we also conclude that appellant knowingly and voluntarily waived his *Miranda* rights.

Once waiving his *Miranda* rights, appellant could have cut off questioning by subsequently asserting his Fifth Amendment privilege or his right to counsel. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1526.) But to reclaim those rights appellant would have had to make clear his intention, demonstrating an unambiguous and unequivocal request for a lawyer or unambiguously invoking his right to remain silent, which he did

not do.  (*Davis v. United States* (1994) 512 U.S. 452, 461; *Thompkins*, *supra*, 560 U.S. at p. 381; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)  Remaining mute in response to a particular question or questions does not suffice to invoke the previously waived rights.  (*People v. Bowman* (2011) 202 Cal.App.4th 353, 363 (*Bowman*); see also *People v. Silva* (1988) 45 Cal.3d 604, 629–630 ["A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.'  [Citation.]"].)  Here, appellant did not clearly or unambiguously invoke his Fifth Amendment rights after impliedly waiving them.  The trial court therefore properly denied the *Miranda* motion.[4]

### 2. The **Doyle** *rule*

In *Doyle*, *supra*, the United States Supreme Court held a defendant's silence in reliance on *Miranda* warnings cannot be used to impeach him if he testifies at trial.  (426 U.S. at pp. 617-619.)  In that case, two codefendants testified at trial that they had been framed by a co-participant in a marijuana deal, and the prosecutor cross-examined them as to why they had not told the arresting officer that story.  (*Id*. at pp. 612-615 & fn. 5.) The court held the impeachment with their prior silence violated their due process rights because they had been Mirandized.  "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.  In such circumstances, it would be fundamentally unfair and a deprivation of due process [under the Fourteenth Amendment] to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."  (*Id*. at p. 618, fn. omitted.)  Calling silence following *Miranda* advice "insolubly

---

[4] Appellant does not directly challenge the waiver ruling on appeal, although he does quote trial counsel's arguments against a finding of waiver and continues to argue that the trial court "allow[ed] the jury to infer [the] defendant's guilt from his *exercise* of a constitutional right," even though the trial court ruled that he had waived, not exercised, his rights.  (Italics added.)  These references are insufficient to raise the propriety of the *Miranda* ruling on appeal.  (See *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 294 ["Because this argument is not presented under a separate heading, it is forfeited."]; *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1503-1504, fn. 2; Cal. Rules of Court, rule 8.204(a)(1)(B).)

ambiguous," the court held that, because the *Miranda* advice could have induced the defendants' silence, use of that evidence against them at trial violated due process. (*Id.* at p. 617 ["Silence in the wake of these [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights"].) The *Doyle* rule also prohibits the prosecution's use of a defendant's post-*Miranda* silence as evidence of guilt during the prosecution's case-in-chief. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 (*Coffman*); *Bowman*, *supra*, 202 Cal.App.4th at p. 363.)

The Attorney General asserts appellant's claim was forfeited because *Doyle* error was not raised below. (*People v. Tate* (2010) 49 Cal.4th 635, 691-692; *Coffman*, *supra*, 34 Cal.4th at p. 118; *People v. Crandell* (1988) 46 Cal.3d 833, 879, fn. 14.) We note that appellant's trial counsel did not object to the prosecutor's examination of Koutsoubos on grounds that the testimony was inadmissible under *Doyle*. Rather, he objected on grounds that the questions were irrelevant, leading and argumentative. Therefore, we agree that no appropriate objection was registered at the time of Koutsoubos's testimony, and that any error in admitting the evidence was forfeited.

Defense counsel also did not preserve the issue that the prosecutor's argument about the inferences to be drawn from appellant's silence violated *Doyle*. The Attorney General argues again that his failure to object forfeited any claim of error on appeal, and again we agree. Although defense counsel objected to several of counsel's arguments relating to the Koutsoubos interview, his only stated ground was "improper" argument, not "*Doyle* error." In other instances he made no objection at all.[5]

Nevertheless, to forestall any future claim that appellant's counsel provided ineffective assistance by counsel's failure to object we discuss, and reject, the claim of *Doyle* error on its merits.

---

[5] As to the jury instruction issue, though, we conclude the *Doyle* issue was not forfeited because appellant's pretrial motion under *Miranda*, discussed above, coupled with his trial objection to the adoptive admissions instruction, was sufficient to preserve the *Doyle* issue for appeal. (See *People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Morris* (1991) 53 Cal.3d 152, 189-190.)

The essence of the *Doyle* rule is that it is fundamentally unfair for the government to use a defendant's silence as probative of guilt after it has *induced* that silence through the implicit assurance in the *Miranda* advisement that his silence will not be used against him. (*Doyle*, *supra*, 426 U.S. at pp. 418-419; *People v. Thompson* (1986) 183 Cal.App.3d 437, 441-443 [*Doyle* prohibits comment on "on a defendant's *assertion* of his constitutional right to remain silent" (italics added)]; *Bowman*, *supra*, 202 Cal.App.4th at p. 365.) But here, the trial court's correct ruling that appellant did not invoke his right to remain silent under *Miranda* (which is not challenged on appeal) effectively disposes of all of the *Doyle* issues. *Doyle* does not bar use of post-*Miranda* silence if the defendant, as here, has waived his Fifth Amendment privilege.

For example, it has been held that when a defendant waives his *Miranda* rights and voluntarily talks to police, even if he later invokes his rights, the prosecutor may use the defendant's statements—and omissions—that occurred after the waiver but before the invocation. (*People v. Clem* (1980) 104 Cal.App.3d 337, 342-344 [defendant's statements to police omitting certain incriminating elements properly used against defendant through cross-examination and prosecutorial comment, even though defendant later invoked his *Miranda* rights]; *People v. Farris* (1977) 66 Cal.App.3d 376, 387-390 [defendant properly cross-examined about matters he omitted from his statement after waiver of *Miranda* rights and before assertion of them].)

Under *Bowman*, *supra*, having once decided to waive his Fifth Amendment privilege by continuing his dialogue with Koutsoubos, appellant was not entitled to selectively answer some questions but not others: " 'Once a defendant elects to speak after receiving a *Miranda* warning, his or her refusal to answer questions may be used for impeachment purposes absent any indication that such refusal is an invocation of *Miranda* rights.' " (*Bowman*, *supra*, 202 Cal.App.4th at pp. 365, quoting *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1093; but cf. *Coffman*, *supra*, 34 Cal.4th at p. 119 [declining to decide the issue because any error would not have been prejudicial].)

Thus, the California courts have held the *Doyle* rule does not foreclose use of the defendant's post-*Miranda* silence in "selective silence" cases. (*Bowman*, *supra*, 202

10

Cal.App.4th at pp. 362-365.) If the suspect continues talking, even though he may stand mute in response to certain questions, the waiver still applies. (*People v. Silva*, *supra*, 45 Cal.3d at pp. 629–630; *People v. Thomas* (2012) 211 Cal.App.4th 987, 1005.)

### 3. *It Was Not Error to Instruct the Jury With CALCRIM No. 357*

During the jury instruction conference, the prosecutor requested the standard adoptive admissions jury instruction, which reads: "If you conclude that someone made a statement outside of court that accused the defendant of the crime and the defendant did not deny it, you must decide whether each of following is true: [¶] One: The statement was made to the defendant or made in his presence. [¶] Two, the defendant heard and understood the statement. [¶] Three, the defendant would, under all the circumstances, naturally have denied the statement if he thought it was not true. [¶] And four, the defendant could have denied it but did not. If you decide that all these requirements have been met, you may conclude that the defendant admitted the statement was true. If you decide that any of these of requirements has not been met, you must not consider either the statement or the defendant's response for any purpose." (CALCRIM No. 357.)[6]

Appellant objected on grounds that he had been "attempting to invoke his rights to remain silent" during the interrogation. The trial court overruled appellant's objection. The court noted it had previously determined that appellant was properly advised of his *Miranda* rights and did not invoke his right to remain silent. The court instructed the jury with CALCRIM No. 357, adapting it to fit the evidence.

In light of our conclusions that the trial court did not err in finding that appellant had knowingly and voluntarily waived his *Miranda* rights, and that there was no ensuing *Doyle* error in admitting the testimony of Koutsoubos concerning what transpired during his interrogation of appellant, it was proper to instruct the jury with CALCRIM No. 357.

---

[6] Evidence Code section 1221 reads: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

11

### *4. Failure to Modify the Standard Language of CALCRIM No. 357*

Even if the adoptive admission rule may be relied on in some instances, appellant contends the court should have modified CALCRIM No. 357 at least to allow the jury to decide whether appellant's silence constituted an exercise of his Fifth Amendment rights. Again, we must first address the question of forfeiture.

It is well settled that "a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156; see also § 1259.) Even so, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or *incomplete* unless the party has requested appropriate clarifying or amplifying language. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570; *People v. Tuggles* (2009) 179 Cal.App.4th 339, 364.) Although defense counsel objected to the giving of the instruction altogether, he did not claim it was incomplete. The issue has been forfeited under *Guiuan* and similar authority.

Yet, once again to forestall a future claim of ineffective assistance of counsel we choose to address the merits of this claim.**[7]** In doing so, we find appellant's assertion is not well taken.

Appellant does not question that a defendant's silence may, in appropriate circumstances, be admitted against him. Indeed, his brief on appeal includes a quote from our Supreme Court's description of the "adoptive admission rule" in *People v. Preston* (1973) 9 Cal.3d 308, 313-314 (*Preston*): "If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the

---

**[7]** Appellant argues that his counsel rendered ineffective assistance by failing to object. This claim is raised for the first time in appellant's reply brief, which justifies our treating it as waived at this juncture. (*Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3; *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 368.)

accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.  [Citations.]"

However, appellant contends the court erred in instructing the jury on the adoptive admission rule because it left out the "requirement" that the circumstances must not "lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment."

While this factor was included in the *Preston* opinion as a prerequisite for application of the adoptive admissions rule, *Preston* did not identify it as a *jury* issue.  On the contrary, whether the defendant was relying on his "right of silence" or waiving it goes to the question of admissibility, which was the judge's decision to make.  Appellant was not entitled to have the jury revisit that issue in applying the adoptive admissions instruction.  (See *People v. Alcala* (1992) 4 Cal.4th 742, 787; *People v. Carroll* (1970) 4 Cal.App.3d 52, 58-61; Evid. Code, § 405.)  Accordingly, we conclude CALCRIM No. 357 was legally correct and required no modification.

### 5. *The Prosecutor's Closing Argument*

Given the *Miranda* waiver, at trial Koutsoubos was allowed to testify during the prosecution's case in chief that he interviewed appellant at the sheriff's station, informed him he was under arrest for attempted homicide, and gave him the required *Miranda* warnings, but appellant continued talking with him in a limited fashion.

When appellant remained mute in response to several questions, Koutsoubos started suggesting possible mitigating circumstances, such as "if Mr. Ortiz was possibly getting beaten to within an inch of his life," maybe appellant felt he had to intervene. Appellant did not respond.  The prosecutor proposed a series of hypothetical answers that appellant could have given to Koutsoubos's questions, but did not give.  For instance, in response to the hypothetical about Ortiz being beaten, appellant did not say, "Exactly, that's why I had to stab him."  He did not say, "Yes, I was justified.  I had to.  Ruben Ortiz was getting hurt."  He did not tell Koutsoubos that Castellanos had Ortiz in a headlock and appellant "had to stab him."  He did not say anything at all at any time

during the interview about "self-defense" or defense of Ortiz. Appellant also did not say, "[i]t wasn't me," or "[y]ou have the wrong guy."

Koutsoubos testified he continued trying to get appellant to give his version of the events, but appellant did not try to explain. He simply said, "Well, your mind is made up already." And, "You guys got witnesses. I'm going to jail." The DVD of the interview was not played for the jury; only Koutsoubos's testimony about it was received.

During closing argument, the prosecutor suggested to the jury that appellant's defense-of-others story was "contrived" because he had not told that story to Koutsoubos.

The prosecutor remarked that appellant's failure to mention defense of Ortiz to Koutsoubos "is your first bright red flag that the self-defense is contrived. Because he never said it during his interview. He had an opportunity to say, look, I am sorry that David Castellanos got stabbed. I had to do it, Ruben was blue and white, whatever. He didn't do it. That would have been the time. And that's when you know self-defense is real."

After asserting that a person legitimately relying on such a defense would ordinarily "report the crime to the police," counsel observed there was "[n]ot even a peep from the defendant. [¶] Detective Koutsoubos threw it out there, were you justified? Nothing. Now, here's the thing, defendant never says it wasn't me. He says you're arrested on a *Ramey* warrant for attempted murder. Defendant says, does he say it wasn't me, I didn't stab him, you don't know the whole story? Nothing. Nothing. I mean, would it have been logical for the defendant [to] deny it? Yes. [¶] Because when Detective Koutsoub[o]s [*sic*] accuses the defendant of hiding out at Chester Hensley's house, the defendant says, I was not. So he'll deny that, but he doesn't deny the attempt[ed] murder, either that it was him or it was justified."

In the prosecutor's rebuttal argument, counsel further emphasized what appellant had *not* told Koutsoubos: "He argues too, it happened so fast. [¶] The defendant didn't tell Detective Koutsoubos that it happened so fast. The defendant didn't tell Detective Koutsoubos that Ruben was blue." The prosecutor's final remarks were: "When he was interviewed, he never claimed self-defense. Well, if that's the truth, tell the truth. If

14

that's the truth, tell the detective, I'm here wrong man or I'm here you [*sic*] unjustifiably. I had to stab him. If that's the truth, say so. And maybe no charges would have ever even been brought. [¶][¶] Now, defendant wants to manipulate the system into working for him, with an outrageous contrived claim of self-defense. Reject it. It is blatantly false. It would ruin the legitimacy of a true self-defense, when truly innocent people need to use it. Thank you."

Appellant contends on appeal this amounted to a *Doyle* violation. Because we have determined that admission of evidence as to what occurred during the interrogation was not *Doyle* error, we also reject appellant's claim that the prosecutor's comments on that evidence, which were consistent with the adoptive admission rule, violated appellant's Fifth and Fourteenth Amendment rights.

## V.

## DISPOSITION

The judgment is affirmed.

_____
RUVOLO, P. J.

We concur:

_____
REARDON, J.

_____
RIVERA, J.

15