[No. E036279. Fourth Dist., Div. Two. Dec. 19, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLEN KEITH CHAMPION, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of part 4.

COUNSEL

Mark L. Christiansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, James D. Dutton and Michael T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GAUT, J.—

## 1.  Introduction

Defendant Allen Keith Champion appeals from a judgment convicting him of 40 counts of lewd and lascivious acts against his daughter and his niece, both of whom were under 14 years of age, in violation of Penal Code sections

288, subdivision (a), and 667.61, subdivision (e)(5). The trial court sentenced defendant to 47 years to life.

On appeal, defendant claims the trial court erred in admitting evidence that he invoked his right to remain silent during a police interrogation and instructing the jury that such evidence could be considered in determining his credibility. We conclude that the prosecutor's reference to defendant's refusal to speak with the police was a fair response to defendant's claim that he was not given the opportunity to tell his side of the story. We also conclude that the court's instruction properly applied Evidence Code section 913 to the circumstances in this case.

The People note that the trial court erred in sentencing defendant under both the determinate and indeterminate sentencing laws. Penal Code section 667.61, subdivision (b), however, requires that the court impose an indeterminate sentence of 15 years to life for each count instead of the determinate sentence.

We affirm defendant's convictions but remand for resentencing.

## 2. Factual Statement

During their short romantic relationship, defendant and Christy D. had their daughter, C. Before C.'s birth in 1989, Christy moved to Oregon while defendant remained in California. Defendant married Kelly C. shortly after Christy's move. When C. was six years old, she began staying with defendant during her summer vacations, spring vacations, and at Christmas. At age 10, C. began living with defendant on a permanent basis.

When C. was eight, defendant began to touch her inappropriately. He would give C. a back rub and then slide his hand down to her chest and feel her nipples, both over and under her clothing. After C. moved in with defendant permanently, the molestations progressed and occurred more frequently. Defendant would remove C.'s top and fondle and lick her breasts. By the time C. was 11, defendant also would undress her and touch her vagina with his penis, moving up and down against her. Although defendant did not penetrate her with his penis, on a few occasions, he did engage in digital penetration. Also on a few occasions, he put her hand on his penis and moved her hand up and down. The molestations were an everyday occurrence. They occurred in the living room or C.'s bedroom of defendant's trailer home, both at night and during the day. At night, C. often pretended to be asleep.

C. also observed defendant engage in inappropriate conduct with her cousin and best friend, S., who was two years older. According to S.'s initial report, on about 40 occasions, defendant touched her breasts both under and over her clothing. Defendant often came to the girls at night and touched them as they pretended to be asleep.

C. told S.'s mother, Linda L., about the molestations. Linda told other family members and friends, who in turn confronted defendant. There was testimony that, during this family meeting, defendant attempted to characterize his relationship with C. as consensual. There also was testimony that, as C. was questioned and pressured, she eventually said that nothing happened. After the meeting, no action was taken, except that Kelly told C. to keep her doors locked. The molestations ceased for about five months. During this time, C. denied that she was molested when questioned by a social worker and relatives.

S. initially told several people, including the police, that defendant molested her. S. later recanted during interviews with a social worker and an investigator. At the preliminary hearing and at trial, she testified that she had lied about the molestation.

About five months after C.'s initial disclosure, the molestations resumed as before. On one occasion, defendant attempted to insert his penis in C.'s vagina but was unsuccessful.

About October of 2001, C. again confided in relatives about the molestation. C.'s stepsister eventually informed Kelly that the molestations had resumed. C.'s mother, Christy, also learned about the molestation and drove down from Oregon to pick up her daughter.

The police interviewed C., who was about 12 years old at the time. C. admitted that defendant had molested her since she was eight years old.

Defendant denied molesting both C. and S. Defendant explained that C. had been exposed to her mother's promiscuity and, as a result, behaved inappropriately toward him.

### 3.   Defendant's Prior Statement and Testimony

Defendant claims the trial court erred in allowing the prosecutor to question him concerning his police interrogation and, specifically, his exercise of his right to remain silent. Defendant also claims the court erred in instructing the jury that this evidence could be considered in determining his credibility.

## A. *Background*

During the trial defendant testified that he was never given an opportunity to tell his side of the story. In rebuttal, the prosecution sought to introduce evidence that, during his police interrogation, defendant was given an opportunity to make a statement but he refused. Defendant's trial attorney objected that the prosecutor had no right to comment on defendant's decision to invoke his *Miranda* rights.[1] The court overruled the objection.

The prosecutor cross-examined defendant on the subject:

"Q. . . . Mr. Champion, you are willing to lie to this jury in order to get out of this; aren't you?

"A. No.

"Q. Yesterday you actually tried to mislead this jury in order to get them to vote not guilty; didn't you?

"A. No, I did not.

"Q. Well, you recall being asked specifically did anybody ever come to you and say, Okay, tell me your side of the story. [¶] You recall being asked that; don't you?

"A. Yes.

"Q. And your answer was, No, never.

"A. Correct.

"Q. But in fact, you were contacted in October of 2001, by Officer Underwood of the Murrieta Police Department; correct?

"A. Yes.

"Q. And he invited you to come tell you[r] side of the story?

"A. Yes.

"Q. He invited you to make a statement?

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

"A. Yes.

"Q. So somebody did offer to hear your side of the story.

"A. Yes. They wanted me to speak with them.

"Q. The story that you told us yesterday, that's the first time you've given that story; isn't it?

"A. No.

"Q. First time you've publicly given that story; isn't it?

"A. Yes."

During redirect examination, defendant's attorney clarified with defendant that he was referring to his family members. Defendant's attorney also clarified that, although defendant was given an opportunity to speak to the police, he had the right to remain silent. Defendant explained that he had "been advised not to say anything unless a lawyer is present. Because [the police] could twist what you say around and make it look like you say something you have not said. . . ."

On recross-examination, the prosecutor again questioned defendant concerning his unwillingness to come forward with a statement during his initial incarceration. The prosecutor insisted that defendant admit that he did not volunteer his side of the story even after receiving the assistance of counsel.

After admitting the evidence, the court decided to give the jury a limiting instruction. Although the court initially intended to give the instruction after the prosecution's examination, the court delivered it after the other jury instructions. Defendant's attorney requested that the court also advise the jury that they could not use the evidence to draw an inference as to defendant's credibility as prohibited under Evidence Code section 913. The court decided, however, that the jury should be allowed to use the evidence in determining defendant's credibility.

The court instructed the jury as follows:

"Certain evidence was admitted for a limited purpose. The defendant testified on his direct examination that no one ever gave him a chance to tell his side of the story. On cross-examination, evidence was received in rebuttal tending to show that the defendant was offered a chance to tell his side of the

story by the police. On redirect examination by his attorney, that is defendant's attorney, further evidence was received showing that the defendant declined to speak to the police, thereby exercising his constitutional right to remain silent.

"Now, you may consider the evidence that the defendant was offered a chance to tell his side of the story by the police for the limited purpose of showing defendant's credibility. However, since the defendant had a constitutional right to remain silent when contacted by the police, the fact that he exercised that right and declined to speak is not to be held against him in any way, and may not be used to infer whether he's guilty or not guilty.

"Do not consider the evidence of the defendant being offered the chance to tell his side of the story to the police and the fact that he declined to do so for any purpose, except the limited purpose for which it was admitted."

During closing argument, the prosecutor discussed the evidence in challenging defendant's credibility:

"Lies, lies, lies. We're going to talk about one lie, and I'm going to talk about what the law says about men like him who take the stand and lie.

" 'Nobody ever gave me an opportunity to tell my side of the story.' [¶] . . . [¶]

"That was a complete falsehood. It was designed to mislead you, because Officer Underwood asked him to speak, offered him an opportunity to explain. Called him on the phone, please come in and tell your side of the story."

The prosecutor continued his argument by discussing defendant's possible motivations for lying. The prosecutor also emphasized that the jury could consider the lie in determining defendant's credibility. Specifically, the prosecutor read the standard instruction on willfully false testimony and invited the jury to reject defendant's testimony altogether. The prosecutor went on to address several other instances of lies and inconsistencies in defendant's testimony.

## B. *Law and Analysis*

■ Both federal and state courts have held that the prosecution's use of a defendant's post-*Miranda* silence is a violation of federal due process. (*Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240]; *Wainwright v. Greenfield* (1986) 474 U.S. 284, 295 [88 L.Ed.2d 623, 106

S.Ct. 634]; *People v. Crandell* (1988) 46 Cal.3d 833, 878 [251 Cal.Rptr. 227, 760 P.2d 423].) " '*Wainwright* and *Doyle* are founded on the notion that it is fundamentally unfair to use post-*Miranda* silence against the defendant at trial in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. [Citation.]' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 65 [17 Cal.Rptr.3d 710, 96 P.3d 30], citing *Wainwright v. Greenfield, supra*, at p. 295.) The prosecutor cannot use the defendant's invocation of his right to remain silent or refusal to answer questions as evidence against him. (See *Wainwright, supra*, at p. 295; *Coffman and Marlow, supra*, at p. 65.) Particularly, the defendant's silence may not be used to impeach his credibility. (See *Jenkins v. Anderson* (1980) 447 U.S. 231, 240 [65 L.Ed.2d 86, 100 S.Ct. 2124]; *People v. Wood* (2002) 103 Cal.App.4th 803, 808 [127 Cal.Rptr.2d 132]; see also Evid. Code, § 913.)

To establish a violation of due process under *Doyle*, the defendant must show that the prosecution inappropriately used his postarrest silence for impeachment purposes and the trial court permitted the prosecution to engage in such inquiry or argument. (*Greer v. Miller* (1987) 483 U.S. 756, 765–766 [97 L.Ed.2d 618, 107 S.Ct. 3102]; *People v. Evans* (1994) 25 Cal.App.4th 358, 368 [31 Cal.Rptr.2d 20].) "The type of permission specified in *Greer* will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (*Evans, supra*, at p. 368.)

An assessment of whether the prosecutor made inappropriate use of defendant's postarrest silence requires consideration of the context of the prosecutor's inquiry or argument. (*Greer v. Miller, supra*, 483 U.S. at pp. 765–766.) A violation of due process does not occur where the prosecutor's reference to defendant's postarrest silence constitutes a fair response to defendant's claim or a fair comment on the evidence. (See *United States v. Robinson* (1988) 485 U.S. 25, 32 [99 L.Ed.2d 23, 108 S.Ct. 864] (involving a claim of error under *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]); *Anderson v. Charles* (1980) 447 U.S. 404, 408 [65 L.Ed.2d 222, 100 S.Ct. 2180].) "*Griffin* and *Doyle*'s protection of the right to remain silent is a 'shield,' not a 'sword' that can be used to 'cut off the prosecution's "fair response" to the evidence or argument of the defendant.' [Citation.] Questions or argument suggesting that the defendant did not have a fair opportunity to explain his innocence can open the door to evidence and comment on his silence. [Citation.]" (*People v. Lewis* (2004) 117 Cal.App.4th 246, 257 [12 Cal.Rptr.3d 1], citing *People v. Austin* (1994) 23 Cal.App.4th 1596, 1612–1613 [28 Cal.Rptr.2d 885], disapproved on other grounds in *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867 [103 Cal.Rptr.2d 13, 15 P.3d 234].)

In *Austin*, after an officer testified that one of the defendants had made an incriminating statement, the defendant's attorney asked the officer if he had given the defendant an opportunity to make a full and complete statement. The officer admitted that he had not. The prosecutor later elicited testimony from the officer that, after advising the defendant of his *Miranda* rights, he had offered to take the defendant's full statement, but the defendant declined. On appeal, the defendant claimed that the prosecutor's reference to his post-*Miranda* silence violated his due process rights under *Griffin* and *Doyle*.

In addressing the defendant's claim, the court explained: "*Griffin* and *Doyle* were cases in which the prosecution sought to take unfair advantage of the defendant's silence. . . . These cases stand for the principle it is fundamentally unfair for the state to afford defendants the right to remain silent and then use that silence against them. It must be remembered, however, the defendant's right to remain silent is a shield. It cannot be used as a sword to cut off the prosecution's 'fair response' to the evidence or argument of the defendant." (*People v. Austin, supra*, 23 Cal.App.4th at pp. 1611–1612, citing *United States v. Robinson, supra*, 485 U.S. at p. 32; see also *People v. Thompson* (1986) 183 Cal.App.3d 437, 442 [228 Cal.Rptr. 304].)

Relying on the analysis in *Robinson*, the court in *Austin* held that the prosecutor's inquiry did not amount to a due process violation. The court explained that the evidence allowed the prosecution to counter the impression created on cross-examination that the defendant had not been afforded an opportunity to explain the incriminating statement. (*People v. Austin, supra*, 23 Cal.App.4th at p. 1612.) The court made the general observation that, "[t]he Fifth Amendment protects defendant's right to remain silent. It does not protect his effort to exploit his silence by requiring the government also remain silent." (*Ibid.*) The court specifically noted that, "[t]here was no attempt to suggest defendant's invocation of his right to remain silent was substantive evidence of guilt or to impeach a defense by bringing out Austin's postarrest silence." (*Id.* at pp. 1612–1613.) The court held, therefore, that the prosecution's conduct did not amount to error under *Griffin* or *Doyle*. (*Id.* at p. 1613.)

Defendant attempts to distinguish *Austin* by arguing that the defendant in that case specifically suggested that the police did not give him an opportunity to explain his statement. Defendant argues that, in this case, the prosecution inquiry was not an attempt to put a prior statement in context, but an effort to bring out defendant's postarrest silence. While this is a closer case, the trial court reasonably found that the impression left by defendant's

statement that he was never given an opportunity to tell his side of the story was more inclusive than simply a reference to his pretrial discussions with his family.

The *Austin* court relied on *United States v. Robinson, supra,* 485 U.S. 25. In *Robinson,* the defendant's attorney urged in closing argument that the defendant had not been given the opportunity to explain his side of the story. The prosecutor responded in kind by arguing that the defendant could have taken the stand and explained his story. In addressing the defendant's claim of *Griffin* error, the court noted that defense counsel's comment was interpreted as meaning that the government had not allowed defendant to explain his side of the story either before or during the trial. (*Robinson, supra,* at p. 31.) Because the defense comment could have given the jury the false impression that the defendant was not allowed to testify during the trial, the prosecutor's argument constituted a fair response to the defendant's claim. (*Id.* at p. 32.) The court explained, "[i]n the present case it is evident that the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case. Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." (*Ibid.*)

### C.  *Prosecutor's Questions*

In this case, defendant's attorney elicited testimony from the witnesses that no one would listen to his side of the story. During his direct examination, defendant also testified that no one gave him the opportunity to give his side of the story. The prosecutor argued that this evidence could have left the jury with the impression that defendant was never given an opportunity to give his side of the story to anyone, including law enforcement. The court agreed with the prosecutor and overruled defendant's objection.

During the prosecutor's initial line of questioning, the prosecutor confronted defendant with the fact that he was given an opportunity to tell his side of the story to Officer Daryl Underwood. The inquiry focused on Underwood's offer to take defendant's statement, not defendant's exercise of his constitutional rights. In other words, the prosecutor sought to rebut defendant's claim that he had not been given an opportunity to tell his side of the story. The prosecutor was not taking unfair advantage of defendant's

exercise of his right to remain silent as substantive evidence that he had a guilty conscience or was hiding something. (See *People v. Eshelman* (1990) 225 Cal.App.3d 1513, 1521 [275 Cal.Rptr. 810].)

On redirect examination, defendant clarified that his prior statements were in reference to his family members, namely, that none of his family members allowed him to explain himself. Defendant also testified that, after his arrest, he was given his *Miranda* rights and he elected to invoke his rights based on the advice of counsel.

The prosecutor then insisted that defendant could have volunteered his side of the story after being afforded his constitutional rights, particularly after receiving the assistance of counsel. Defendant admitted that he never came forward with his version of the facts.

▆▆ Under these circumstances, we conclude that the prosecutor was not taking unfair advantage of defendant's exercise of his constitutional right to remain silent. Instead the prosecutor's inquiry was a fair response to defendant's claim. (See *United States v. Robinson, supra*, 485 U.S. at p. 32; see also *Amirault v. Fair* (1st Cir. 1992) 968 F.2d 1404, 1406.) Although the prosecutor referred to defendant's exercise of his *Miranda* rights on recross-examination, defense counsel first mentioned defendant's election to invoke his constitutional rights during his redirect examination. The prosecutor simply responded that, even after invoking his constitutional rights, defendant still could have come forward with his side of the story. The prosecutor deliberately focused his inquiry on rebutting defendant's claim, not exploiting defendant's postarrest silence.

### D. *Prosecutor's Argument*

In addition to challenging the prosecutor's questions, defendant argues that the prosecutor made inappropriate references to his postarrest silence during closing argument. Defendant, however, may have waived this claim by failing to object to the prosecutor's argument. (See *People v. Hughes* (2002) 27 Cal.4th 287, 372 [116 Cal.Rptr.2d 401, 39 P.3d 432].) It also is questionable whether defendant can establish error under *Doyle* without demonstrating that the trial court specifically permitted the comments. (See *Greer v. Miller, supra*, 483 U.S. at pp. 765–766; *People v. Evans, supra*, 25 Cal.App.4th at p. 368.)

Nevertheless, the record shows that the prosecutor's closing argument also focused on defendant's assertion that he was never given the opportunity to explain himself, rather than defendant's invocation of his constitutional rights. The prosecutor argued that defendant was a liar because the facts

refuted his claim that he was not given an opportunity to tell his side of the story. As mentioned *ante*, the prosecutor was not arguing that defendant was a liar simply because he had exercised his right to remain silent and refused to talk to the police. Although the factual distinction is subtle, the difference is considerable for purposes of determining whether there has been a violation of defendant's constitutional rights. (See *United States v. Robinson, supra,* 485 U.S. at p. 32.) In this case, the prosecutor did not take unfair advantage of defendant's postarrest silence. The prosecutor's inquiry and argument instead constituted a fair response to defendant's testimony.

### E. *Trial Court's Instruction*

Defendant claims that the trial court erred in denying defense counsel's request for further instruction based on the language in Evidence Code section 913.

■ Evidence Code section 913, subdivision (a), prohibits the court and counsel from commenting on a witness's exercise of his privilege not to testify. The statute also prohibits the trier of fact from using the witness's exercise of his privilege to draw an inference as to any matter at issue in the proceeding, including the witness's credibility. (See also *People v. Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Evidence Code section 913, subdivision (b), requires that the court, upon request, give an instruction "that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

We conclude that the court satisfied this requirement by giving the special instruction. Although the court did not use the exact terms found in Evidence Code section 913, the court tailored the instruction to fit the circumstances of the present case. As consistent with the *Robinson* case, the court allowed the jury to consider the evidence to rebut defendant's testimony on direct that he had not been given an opportunity to tell his side of the story. Aside from this limited purpose, the evidence of defendant's refusal to answer questions during the police interrogation was not to be "held against him in any way." The court instructed that, because defendant had a constitutional right to remain silent, defendant's exercise of that right could not be used to infer his guilt or innocence.

■ Although a better instruction would have included an admonition that defendant's exercise of his right to remain silent could not be used to draw any inference as to his credibility, such admonition may have been confusing under the circumstances where the evidence was being admitted for a limited impeachment purpose. Even defendant's attorney later agreed with the prosecutor that, "the jury could consider it with respect to his credibility in light

of his previous testimony." The trial court instructed the jury to draw a distinction between using evidence of the police interrogation to rebut defendant's assertion that he had not been able to give his side of the story and using defendant's invocation of his right to remain silent to draw any other inferences in determining his guilt or innocence. Juries are presumed to be able to make fine distinctions concerning the purposes for which evidence is admitted. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [2 Cal.Rptr.3d 186, 72 P.3d 1166].) While the court's instruction is not the model of clarity, we conclude that it adequately conveyed the limitation provided in Evidence Code section 913 as it applied to the facts in this case.

### F.  *Harmless Error*

Even if defendant had established that error resulted from the court's instruction or the prosecutor's questions and comments, we conclude that the error was harmless beyond a reasonable doubt. (See *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 64, citing *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) Despite some evidence that the children recanted, it is hard to imagine a stronger case of child molestation in the absence of direct physical evidence.

The entire case hinged on the jury's assessment of the witnesses' credibility. During closing argument, the prosecutor argued that C.'s and S.'s disclosures were believable and that they had no real motivation to lie concerning the molestation. According to the defense theory, C. was infatuated with her father and wanted him to treat her as his wife. C. was jealous of Kelly and wanted her out of the picture. Defendant argued that S. also fabricated her allegations of molestation because she and C. were plotting to force Kelly to leave defendant.

The record, however, fails to support the defense theory. C. waited years before telling anyone that her father molested her. Both of the children did not discuss the molestation with a parent, social worker, or police officer. Their first disclosure was to a close, trusted friend or relative. The record shows that S. did not volunteer this information, but only admitted the molestation when someone asked her about it. Both of the children did not want to draw attention to themselves or tell others about the molestation.

In challenging defendant's credibility, aside from the prosecutor's use of the police interrogation evidence, the prosecutor also discussed at length the various other inconsistencies between defendant's testimony and the testimony of the other witnesses. Contrary to defendant's testimony, the record is replete with evidence from other witnesses corroborating the victim's allegations of molestation.

Witnesses testified concerning defendant's obsession with C. During the family meeting in March of 2001, Kelly's friend, Tammie Stevenson, heard defendant mention the term "blow job," saying that C. "wanted it." Tammie's daughter, Tarrah Stevenson, also heard defendant say that he fell out of love with his wife and fell in love with C. Tarrah testified that defendant had admitted to Kelly that he had engaged in sexual contacts with C.

During a separate confrontation concerning the molestation, Kelly's daughter, Michelle Hammond, yelled at defendant that he was obsessed with his own daughter and that he was in love with her. Michelle testified that defendant nodded his head in agreement and even admitted that he needed counseling.

During a cruise, Tammie and Kelly walked into defendant's room and observed him in bed with C. The two were not sleeping. Although Kelly dismissed the situation, Tammie's initial reaction was, "what in the F is going on here?" According to Tarrah, Kelly later told her that defendant's explanation was that he was having a dream about having sex with C.

According to the witnesses, defendant also exhibited other suspicious and inappropriate behavior. Defendant began listening in on C.'s telephone conversations. Defendant watched pornographic movies with the children. Also, during a family gathering in September of 2001 at Tarrah's house, Tarrah observed defendant standing on a wooden box looking through the bathroom window. Inside the bathroom, C. and another girl were taking a shower.

After weighing the evidence, including denials from defendant and supporting testimony from his wife, Kelly, the jury reached a verdict during the first full day of deliberations. In order to believe defendant's theory, the jury would have had to reject not only the children's allegations of molestation, but also the testimony of several other witnesses. Because these witnesses corroborated the allegations of sexual misconduct, we are convinced that the jury's verdict was based on the strength of the prosecution's case, rather than any inappropriate use of defendant's postarrest silence.

## 4. <u>Sentencing Error</u>[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1440.

## 5. Disposition

The case is remanded for resentencing. In all other respects, the judgment is affirmed.

Hollenhorst, Acting P. J., and King, J., concurred.

A petition for a rehearing was denied January 9, 2006, and appellant's petition for review by the Supreme Court was denied March 15, 2006, S140518. George, C. J., did not participate therein.