Filed 7/21/15  P. v. Delgado CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>FLOYD ERNEST DELGADO,<br><br>    Defendant and Appellant. | H039181<br>(Santa Clara County<br>Super. Ct. No. CC941853)<br><br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING, NO CHANGE IN<br>JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on June 22, 2015, be modified as follows:

On page 20, at the end of the citation to *People v. Brown* following the first sentence of the first full paragraph ending with "understanding to that effect.])" insert the following footnote:

"In his petition for rehearing, Delgado asserts there was such an understanding or stipulation entered into prior to trial.  During the discussion of the parties' various in limine motions, counsel for Ojeda suggested "that any defense motion would be joined by all other defense counsel unless they specifically opt out."  The trial court responded "that works for most things, but . . . with respect to your own client's priors, I really think that should be mainly your argument to make. [¶] But for the most part, I'm going to assume that. . . .  [I]f I have a question if it doesn't apply to you, I will ask if I think that did come up."  It is clear from the record the parties were discussing joinder in each other's motions in limine, not necessarily joinder in each other's objections throughout

the course of the trial.  Delgado cites no examples from the trial itself where the court questioned whether an objection raised by one defendant applied to either of the other defendants.  In any event, as we discuss below, even if Delgado were deemed to have joined in this particular objection and thus preserved the claim on appeal, the objection is without merit."

Appellant's petition for rehearing is denied.  There is no change in the judgment.

Dated:_____          _____

                                                            Rushing, P. J.

_____

          Márquez, J.

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>FLOYD ERNEST DELGADO,<br><br>      Defendant and Appellant. | H039181<br>(Santa Clara County<br>Super. Ct. No. CC941853) |

Defendant Floyd Ernest Delgado was convicted by a jury of the lesser-included offenses of voluntary manslaughter (Pen. Code, § 192, subd. (a))[1] and assault with a deadly weapon (§ 245) following his acquittal on charges of murder (§ 187) and attempted premeditated murder (§§ 187, 189, 664).  He was sentenced to a total term of 12 years in prison.

On appeal, Delgado argues the trial court committed instructional error and that the prosecutor committed *Doyle*[2] error during opening argument.

We find no error and will affirm the judgment.

---

[1] Unspecified statutory references are to the Penal Code.

[2] *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The prosecution's case

On January 11, 2012, Delgado, Joseph Correa and Ralph Ojeda were charged by amended information with one count of murder (victim Michael Hazard) (§ 187, count 1) and one count of attempted murder (victim Hamilton Hyatt) (§§ 187, 189, 664, count 2).[3]

In connection with count 1, the information specially alleged that Delgado personally used a deadly weapon (§ 12022, subd. (b)(1)), and further alleged that he had suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12), and one prior serious felony conviction (§ 667, subd. (a)).

#### 1. Rochelle Tinsley's testimony

Tinsley lived in an apartment complex at 711 Northrup Street, in San Jose. On April 26, 2009, at approximately 12:30 or 12:45 p.m., Tinsley heard people arguing in the parking lot, so she looked out the window. Three Hispanic men and a "chubby" African-American man, later identified as Hyatt, were standing in the parking lot below her window. One of the Hispanic men, who Tinsley identified at trial as Delgado, and Hyatt were facing off against each other, each of them in a fighting stance. Hyatt loudly asked Delgado, "What's up, motherfucker?" According to Tinsley, Hyatt had his fists up, but she did not see any weapons in his hands. Delgado pulled out a knife, at which point Hyatt took three steps backward, before he turned and ran toward a carport. Delgado, still holding the knife, and another of the Hispanic men chased after him.

About 10 seconds later, Tinsley saw Hazard run into the carport and try to kick the second Hispanic man in the stomach. The second man grabbed Hazard's foot, and Hazard fell to the ground. Delgado stabbed Hazard in the neck as he tried to get up. Hazard made it to his feet, holding his neck, and Tinsley could see blood. Hazard went back to his vehicle and drove away.

---

[3] Ojeda was also charged with being an accessory (§ 32, count 3).

2

### 2. *Hyatt's testimony*

Hyatt dated Delgado's sister, Rachel Duran, for nearly five years. Hyatt testified that he believed he had a good relationship with Delgado overall, saying "We were cool. We were friends."

On the evening of April 25, Hyatt went to a nightclub with Duran and a number of friends to celebrate several of their friends' birthdays. Hyatt's cousin, Hazard, was also at the nightclub.

When the club closed, Hyatt and Duran, and some of their friends, went to the apartment of Hazard's girlfriend. At some point, Duran's female cousin went downstairs with one of Hyatt's male friends, and Hyatt said, "Dang, that's how you hoes get down?" Duran took offense to this remark and she began to argue with Hyatt.

During the argument, Hyatt revealed he had been "messing with another girl and she might be pregnant." Duran slapped Hyatt, "she just flashed on me when I told her that, and she started slapping me and shit and throwing stuff at me," but "I never touched her, not once." He denied hitting Duran. Duran was crying and left, but Hyatt denied following her into the laundry room, shoving her against the wall and choking her. Hyatt admitted he shook up a can of beer and sprayed it on her dress, however. When Duran said she was calling the police, Hyatt left and walked the two blocks to his sister Chanice's apartment, where he spent the night. About an hour later, Hazard, along with a few other friends, joined him.

On the following day, April 26, at approximately 10:00 a.m., Hyatt, Hazard, and two other friends, Dwayne Young and Gerald Greene, got up and went to pick up their friend Greg Thompson, who had been arrested the prior evening. After picking up Thompson from jail, the group went to the residence of Hyatt's cousin, Jasmine Hazard, to eat.

3

Meanwhile, Delgado went to Chanice's apartment and asked to see Hyatt. Delgado seemed agitated and spoke harshly to Chanice. Chanice told Delgado that Hyatt was not there and asked him to leave, which he did.

As they pulled up to Jasmine's place, Hyatt got a telephone call from Satis Chisolm,[4] who was staying with Chanice at the time. Chisolm told Hyatt that Delgado had been looking for him at Chanice's apartment and "he has two--some people with him. I seen [*sic*] people standing by the stairs." Hyatt turned to Hazard and said, "I need to go to my sister's house. Can you take me to my sister's house right now?" Hyatt, Hazard, Young, Greene, and Thompson all drove to Chanice's apartment in Hazard's Ford Explorer. Hyatt believed that Delgado wanted to fight him because of the argument he had gotten into with Duran the night before.

As Hazard parked his vehicle, Hyatt saw Delgado standing in the parking lot. Hyatt got out of Hazard's car and quickly walked toward Delgado. Hyatt was not armed and had no weapons in his possession. His friends got out of the Explorer and were standing nearby. Hyatt asked Delgado, "What the fuck you doing at my sister's house? What's up? What you doing at my--my sister's house?" [*Sic*.] He thought that his hands were "probably closed into a fist, into a ball, but they were still down, like, at my side." Delgado said, "I'm here to fight you," and asked if Hyatt and his friends were going to "jump" him. Hyatt suggested they go to a parking lot next door because he did not want to fight Delgado outside his sister's house.

Delgado looked around, and asked Hyatt, "Why did you hit my sister?" When Hyatt denied hitting Duran, Delgado "started getting real, real red. And . . . then he

---

[4] Chisolm testified that she changed the spelling of her first name from "Satis" to "Sati" at some point in time between the preliminary examination and the trial.

4

reached behind him and pulled a knife[5] out, was, like, 'This is how I'm--this how we get down.' " [*Sic*.]

Hyatt backed away and ran around Hazard's vehicle which was parked nearby. He told Delgado, "Just put the knife down. If--if all you're here to do is fight, we can fight, but just put that knife down." Delgado did not drop the knife and kept walking toward Hyatt. Meanwhile, a second Hispanic man, whom Hyatt did not recognize, approached. The man was not armed, but his fists were clenched. Hyatt asked who he was, but the man just smiled at him "with a mean look on his face," and kept approaching.

Hyatt then noticed Correa running across the parking lot towards him with a knife. Delgado jumped over the hood of Hazard's vehicle and began chasing Hyatt, who ran past the second, unarmed man who stepped aside and let him pass. Delgado and the other two men then chased Hyatt through the carport toward his friends. Hyatt heard Delgado say, "Grab him. Get him." As Hyatt reached the end of the carport, he saw Hazard come "the other way kicking, like a ninja kick, a karate kick in the air." Hyatt heard the kick land "successfully or something," and stopped to look back. He saw Hazard "coming off the ground," as if he had slipped and was getting up. Delgado, Correa and the "third friend" were in a circle around Hazard in the carport, but "backing up, looking confused." He saw Hazard run off towards his car, but he did not see that Hazard was injured.

Hyatt was then joined by Young, who came running out with a glass bottle. Hyatt tried to take the bottle, so he could use it to defend himself. Delgado, Correa and the other man started running off, and Young threw the bottle at them. Hyatt said Delgado called out as they ran out of the parking lot, "I'm going to come back and blast you."

---

[5] At trial, Hyatt described the knife as a "kitchen knife, like a steak knife," approximately eight and one half inches long.

Hyatt learned that Hazard had been stabbed in the melee. He and his friends started toward the hospital, but saw that Hazard had crashed his car a short distance away. Hazard was unconscious. The paramedics arrived and pronounced Hazard dead at the scene.

As Hyatt started to walk back to the apartment complex, he got a call from Duran. He told her, "Your brother just stabbed my cousin in the neck. So I'm going to kill you." He admitted that he was very angry at the time, and was speaking in the "heat of the moment." Delgado also called Hyatt and Hyatt said he "sounded kind of, like, in--like, in shock, like, surprise, like, anxious." Hyatt believed he also threatened Delgado's life during that conversation. Finally, Robert Rudolph, a friend of Delgado's, called Hyatt. Hyatt told Rudolph he was going to come over to his house and kill him and his family.

Hyatt was arrested and spoke to police later that night. Prior to Delgado's trial, he pleaded guilty to making criminal threats to Duran and Rudolph.

Hyatt further admitted having two prior convictions for assault with a deadly weapon other than a firearm and one conviction for grand theft from a person. One of the assaults was committed in conjunction with Hazard.

### 3. Duran's testimony

Duran claimed that Hyatt was angry all night at the party. When they began to argue, Hyatt cornered her, pushed her against a wall and choked her. Duran was able to push him away, but he followed her into the laundry room, where he again pushed and choked her. When her cousin, Christina Griffith, came into the laundry room, Duran was able to get away from Hyatt.[6] Hyatt followed her, then pushed her down onto a couch, and poured beer all over her. After this, she left the apartment and called the police.

---

[6] Griffith testified she walked into the laundry room and saw Hyatt had Duran in a corner. Duran was yelling, upset and crying and later told her Hyatt had choked her.

Duran also texted Delgado about what Hyatt had done to her, and when she spoke to him later that morning, Delgado was very upset.[7]

### 4. Young's testimony

Young testified that when Hyatt received the call telling him Delgado was looking for him, Hyatt yelled, "They're at my sister's house. They're at my sister's house. Let's go. Let's go." Along with Hyatt, Hazard and Greene, Young jumped into Hazard's Explorer to drive to Chanice's apartment. Young said Hyatt was angry, saying "somebody was over there disrespecting her or her house."

After they arrived, Young went up to the balcony of Chanice's apartment, overlooking the scene. He saw Hazard running toward his vehicle, bleeding and holding his neck. Hazard said, "I got hit. I got hit."

Young grabbed an empty vodka bottle and ran downstairs toward Delgado and his compatriots. As he approached, Young said, "You stabbed Michael in the neck." Delgado said, "Whoa, whoa, whoa . . . . Relax," before turning to Hyatt and saying "I'm going to come back and blast you." Delgado and the others turned and ran off. Young threw the vodka bottle at the ground, where it shattered.

Greene said to Hyatt and Young, "Come on. We got to go. We got to go. Michael just got stabbed." Young, Hyatt, and Greene began running along Parkmoor Avenue towards a nearby hospital. They then saw Hazard's vehicle, which had crashed in a parking lot. Hazard was collapsed over the steering wheel, bleeding profusely. When Hyatt tried to open the driver's side door, fire department personnel stopped him.

---

[7] Police recovered a cell phone in Delgado's laundry room which had a text message from Duran from 5:39 a.m. on April 26, stating "Dude, [Hyatt] choked me out tonight, and you weren't even there for me. I had to call the cops on him. He pushed me and poured beer all over me. No reason, nigga." There was also a subsequent text message from Duran at 11:40 a.m., stating, "Just leave it alone. Don't go over there."

### 5. *Thompson's testimony*

Thompson testified that when Hyatt received the call informing him Delgado was looking for him, he appeared a "little upset." Hyatt said he wanted the others to come along with him "in case something happened." On cross-examination, Thompson said he, Hyatt and the others jumped out of Hazard's Explorer when they got to Chanice's apartment complex. Hyatt approached Delgado at a "fast-paced walk." Hazard told Thompson and Greene to stay back so they did. Young went upstairs towards Chanice's apartment. Thompson saw Hazard go over towards Hyatt and Delgado. He heard someone "talk about getting jumped," then saw Hyatt running.

During the altercation, Thompson did not see Delgado stab Hazard. He heard Hazard yell and tell everyone they needed to go because he had been stabbed in the neck. Thompson ran with him back to Hazard's Explorer. Hazard began driving toward a nearby hospital, and "went through two red lights" while Thompson tried to find something to put on Hazard's neck. Hazard had difficulty breathing and began to lose consciousness. He passed out and the vehicle swerved into a parked car.

### 6. *Autopsy*

On April 27, 2009, Dr. Michelle Jorden performed an autopsy on Hazard's body. Dr. Jorden found a stab wound at the base of Hazard's neck which pierced the right lung and the superior vena cava, a major vein. The single stab wound caused massive internal bleeding, resulting in Hazard's death. Dr. Jorden testified that a steak knife[8] such as the one described by Hyatt and other witnesses could have caused Hazard's wound.

### 7. *Investigation and arrest*

After speaking to witnesses, police learned that Delgado and Correa were involved in the stabbing, along with an unidentified third man. On April 27, police pulled over

---

[8] The knife Delgado used was never recovered. Delgado testified he threw it over a retaining wall by Ojeda's apartment onto an adjacent freeway.

8

Ojeda for a traffic violation and ended up searching Ojeda's apartment. The searching officers saw Delgado and Correa at Ojeda's home, but did not yet know they were wanted for questioning in connection with the stabbing. When the connection was made, officers went back to Ojeda's home and arrested Delgado and Correa. When police questioned Ojeda, he admitted he was present during the stabbing whereupon he was arrested as well.

After all three defendants were taken back to the station, they were placed into a holding cell together and their audio monitored and recorded. Excerpts of those recordings were played to the jury and transcripts of those excerpts were admitted into evidence. On tape, Delgado told Correa and Ojeda that he "can't be telling on you guys" and would say, "I went there on my own." Ojeda confessed to Delgado that he had already admitted to police that he was there. Delgado responded, "I can't believe you told them you were there asshole," and Correa said, "They didn't know you were there fool." Delgado also said to Correa, "I guarantee you won't get more than five" and advised that he should "just stick to the script that you weren't there." He also claimed that the "fucking myates are not going to fucking testify and if they do fool you already know it's going to be fucking mob fool."

B.    *Defense case*

1.    *Delgado's testimony*

Delgado testified he woke up on April 26 and saw he had missed numerous calls and text messages from his sister, Duran. When he called her, she told him that Hyatt had "choked her, pushed her, poured beer on her, [and] cussed her out." This made Delgado feel guilty for not going to the party the night before to protect his sister, and it also made him angry at Hyatt. Delgado told Duran he would talk to Hyatt and tell him not to bother her anymore. Duran told him to leave it alone and not go, but Delgado decided he would confront Hyatt anyway.

9

Delgado asked codefendants Correa and Ojeda to accompany him to Chanice's apartment. When they arrived, Correa asked Delgado if he wanted him to go to the apartment with him. Delgado replied, "No. It's cool. I'm just going to talk to him." However, Correa handed Delgado a knife telling him he should take it, "just in case."

Delgado went to Chanice's apartment, but she told him Hyatt was not there. He overheard Chisolm call Hyatt and kind of yell that Delgado was there to "talk to" him. Delgado thought it "seemed weird" and started to leave. He told the women he would come back later. Chanice was being "disrespectful," telling him to "[g]et the fuck away from my house." He told Correa and Ojeda that Chanice was "tripping," and all three men started to walk off.

As they were still in the apartment complex's parking lot, however, Chanice came out on the balcony of her apartment and called out, "[Hyatt]'s here. What's up now, motherfucker?" Delgado saw Hyatt pull up in the Explorer with several other men. They jumped out of the vehicle and ran towards him. Hyatt angrily said, "What's up, motherfucker? You want to come to my sister's house and disrespect? I'm a kill you, cuz. I'm a kill you." [*Sic*.] Delgado was frightened, backed away from Hyatt and said he just wanted to talk. Hyatt and the others continued to advance on him, so Delgado pulled out his knife and waved it around to keep them away. He did not intend to stab anyone with it.

Delgado asked Hyatt why he attacked Duran the night before. Hyatt responded, "I didn't do shit to that bitch. She's a lying ass ho." [*Sic*.] Delgado got angry that Hyatt had called his sister a "bitch" and a "ho," so he "ran at" Hyatt. He was not intending to stab Hyatt, but the knife was still in his hand as he chased him. Delgado had just caught Hyatt by the shirt when suddenly someone punched Delgado in the back of the head.

Delgado let go of Hyatt and turned around. He saw an African-American man, who he did not recognize, holding what appeared to be a small baseball bat. Someone then kicked Delgado in the left hip and he reacted by swinging the knife toward the "big

10

blur" that had kicked him. When Delgado looked down, he saw that Hazard had fallen to the ground, but Hazard quickly jumped up and ran away.

### 2. *Chisolm's testimony*

Chisolm testified Hyatt looked angry when he jumped out of the car to confront Delgado. She heard Delgado ask if Hyatt's friends were going to "jump" him and looked scared. Hyatt said something to the effect of, "My boys are here too." She saw Delgado pull out a knife and make jabbing or flinching movements with it towards Hyatt. As Hyatt turned and ran, Chisolm heard Delgado say, "What's up, fool? Why are you running?"

Chisolm said Hazard "came out of nowhere" and jumped into the air, performing a flying kick. He was in the air when he got stabbed by Delgado's knife. She saw Hazard fall to the ground. He got up holding his neck and ran to his car along with Thompson.

### 3. *Rudolph's testimony*

Delgado called Rudolph that afternoon and, during that conversation, Rudolph told him Hazard was dead. Delgado seemed surprised by the news, and was crying. Based on other sounds he could hear, Rudolph also thought Delgado was vomiting.

### 4. *Correa's testimony*

Correa also took the stand on his own behalf. He testified that he and Ojeda did not go with Delgado to Chanice's apartment, but waited in the car for five or seven minutes first. He thought to himself that it was a mistake to let Delgado go by himself, so he and Ojeda got out and went to find Delgado. Correa saw him walking down some stairs and Delgado told him Hyatt was not there. Delgado said they should go because Hyatt's sister was "acting funny." Correa continued walking back to the car, even though Delgado and Ojeda turned back when they heard a girl yelling. Correa heard someone yell his name, so he ran back towards the apartments.

11

Correa saw Delgado had grabbed Hyatt by his collar when someone came at Correa "pretty fast," and he was hit in the stomach[9] and the eye. Someone tried to grab Correa and he pushed that person away. Correa saw someone else running behind him, and he turned because he thought he was getting attacked again. Correa also saw a man holding a bottle. Delgado began to back away from Hyatt, and Correa said they should go. Correa, Delgado and Ojeda ran through the parking lot back to the car.

When they got back in the car, Delgado "sounded panicked and said, 'I think I stabbed somebody.' " At Ojeda's house later that day, they learned that Hazard had died. Correa described Delgado as being upset: "[he was] crying, throwing up, [and had] wrapped himself in a blanket."

### 5. Mayur Patel's testimony

Patel lived at the apartment complex where the fight occurred. He was coming down from his apartment on the third floor when he heard a fight. Patel saw two Hispanic men arguing with an African-American male.[10] He saw the African-American man swing at one of the Hispanic men, but the Hispanic man hit the African-American man in the jaw, knocking him to the ground. At trial, Patel testified the Hispanic man put the African-American man in a choke hold while he was on the ground, and then the African-American man got up holding his neck. When interviewed by police shortly after the incident, however, Patel said that, none of the Hispanic men continued to attack the African-American man after he was knocked to the ground. Instead, they ran off.

---

[9] When Correa was arrested, police observed and photographed an abrasion on Correa's stomach. Dr. Jorden examined the photograph and testified that the abrasion was caused by blunt force trauma, such as a kick to the stomach or being struck with a small bat. The bruise could have been inflicted within the previous 24 to 25 hours, though it could also have been caused some time outside that range.

[10] Patel testified he did not see any Hispanic men chasing an African-American man around the parking lot or the carport area.

*C.*    *Verdict and sentencing*

On March 26, 2012, Delgado was acquitted of murder and attempted murder, but the jury found him guilty of the lesser included offenses of voluntary manslaughter (§ 192, subd. (a), count 1) and assault with a deadly weapon (§ 245, count 2), respectively.[11] The jury further found true the allegation that Delgado personally used a deadly weapon in the commission of count 1.  In a bifurcated proceeding, the trial court found true the allegations that Delgado suffered one prior strike conviction (§§ 667, subds. (b)-(i), 1170.12), and one prior serious felony conviction (§ 667, subd. (a)).

On November 9, 2012, the trial court sentenced Delgado to prison for a total determinate term of 12 years, consisting of:  (1) the mitigated term of three years on count 1, doubled to six years under section 667, subdivision (e); (2) a concurrent mitigated term of two years on count 2, doubled to four years under section 667, subdivision (e); (3) a consecutive term of one year for the personal use finding; and (4) a consecutive term of five years for the prior serious conviction finding.

II.    **DISCUSSION**

*A.*    *There was no instructional error*

*1.*    *CALCRIM No. 3471*

Delgado contends the trial court incorrectly instructed the jury on self-defense thus violating his state and federal constitutional rights to due process and a fair trial. Specifically, he argues the jury was improperly instructed with CALCRIM No. 3471 to the effect that, if the jury found Hazard suddenly escalated the fight using deadly force, Delgado could only act in self-defense if he was unable to withdraw from the fight. Instead, the trial court should have modified the instruction to make clear that Delgado could act in self-defense only if he could not withdraw *in safety* from the fray.  As

---

[11] The jury acquitted Correa and Ojeda of murder and attempted murder, but convicted Ojeda of being an accessory.

13

discussed below, this contention was forfeited by Delgado's failure to object to the instruction given or request that it be modified. Further, even if he could maintain this claim of error, we find it is without merit.

The trial court instructed the jury pursuant to CALCRIM No. 3471 on an initial aggressor's right to self-defense: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; and [¶] 2. Indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he . . . wanted to stop fighting and that he had stopped fighting; and [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then . . . had a right to self-defense if the opponent continued to fight. [¶] However, . . . if the defendant used only nondeadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to stop fighting or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting. [¶] A fight is mutual when it began or continued by . . . mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim of self-defense arose."

CALCRIM No. 3471 traces its roots to *People v. Hecker* (1895) 109 Cal. 451, which provides that where "one is making a felonious assault upon another, or has created appearances justifying that other in making a deadly counter attack in self-defense, the original assailant cannot slay his adversary and avail himself of the plea unless he has first and in good faith declined further combat, and has fairly notified him that he has abandoned the contest." (*Id.* at p. 463.)

*Hecker* further creates an exception to the foregoing rule. A party who initiated a nonfelonious simple assault may use deadly force in self-defense if (1) the victim counterattacked using deadly force; (2) the counterattack was so sudden and perilous that there was no opportunity for the initial aggressor to decline, or make known his

14

willingness to decline, further fighting; and (3) the initial aggressor could not "retreat with safety." (*People v. Hecker*, *supra*, 109 Cal. at p. 464.)

Delgado seizes on the use of the phrase "retreat with safety" in *Hecker* and subsequent cases, such as *People v. Gleghorn* (1987) 193 Cal.App.3d 196 (*Gleghorn*), in support of his argument that it is not enough to be able to withdraw from combat, but that a defendant must be able to withdraw safely. However, these cases, along with others discussing this concept, use both terms, i.e., "withdraw" and "retreat with safety," interchangeably.

In *Hecker*, before using the phrase "retreat with safety," the California Supreme Court stated, as follows: "The defendant was entitled to have the jury instructed that even if he was in the act of committing a forcible trespass in endeavoring to take the horse, if his act amounted to no more than a trespass, [victim] was not justified in trying to kill him, if he did try, in attempting to prevent it. And if, under these circumstances, [victim] did make the first felonious assault upon defendant, defendant in turn would be justified in killing [victim] if the circumstances of [victim's] felonious assault were sufficient to excite defendant's fears as a reasonable man that he was in danger of death or great bodily injury, and he acted under these fears alone, and had in good faith declined further struggle before firing the fatal shot, or was put in such sudden jeopardy by the acts of deceased that he *could not withdraw*, and if it was thus that [victim] met his death." (*People v. Hecker*, *supra*, 109 Cal. at p. 461, italics added.)

In *Gleghorn*, the court posits the rule as follows: "[W]hen the victim of simple assault responds in a sudden and deadly counterassault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense." (*Gleghorn*, *supra*, 193 Cal.App.3d at p. 201.)

In *People v. Sawyer* (1967) 256 Cal.App.2d 66, the Court of Appeal approved the following instruction: " 'Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his

15

ground and thus defend himself is not immediately available to him, but, instead he first must decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest *unless the attack is so sudden and perilous that he cannot withdraw*.  Only when he has done so will the law justify him in thereafter standing his ground and using force upon his antagonist.' " (*Id*. at p. 75, fn. 2.)

In *People v. Quach* (2004) 116 Cal.App.4th 294, the court quotes the "retreat with safety" language from *Hecker,* then subsequently quotes the "cannot withdraw" language from *Sawyer*.  (*Id.* at p. 302.)

What these cases illustrate is that the concept of self-defense at issue here, i.e., the circumstances in which a nonfelonious assailant may defend himself with deadly force, is adequately conveyed by CALCRIM No. 3471 as given by the trial court.  That instruction accurately reflects the language used not just in *Hecker*, but in every subsequent case addressing that defense.

### 2.	*Delgado failed to object and has forfeited the argument*

Because Delgado did not object to this instruction at trial, or request that it be modified in any way, he has forfeited the argument.  As discussed above, CALCRIM No. 3471 is a correct statement of the law.  "To the extent the instruction was incomplete, defendant may not be now heard to complain because he did not request clarifying language.  '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Jones* (2013) 57 Cal.4th 899, 969.)  "The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel." (*People v. Wolcott* (1983) 34 Cal.3d 92, 108-109.)

### 3. *No reasonable likelihood the instruction was misapplied*

Even assuming Delgado did not forfeit this argument, we reject it on the merits as well. There is no reasonable likelihood a jury would apply the instruction in the way Delgado contends.

"When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation. [Citation.] 'For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Rundle* (2008) 43 Cal.4th 76, 149, disapproved of on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

The concept of withdrawing from a fight in the face of a sudden, deadly counterattack necessarily implies that the one seeking to withdraw be able to do so without harm. There is no reasonable likelihood that jurors would construe the instruction to deny the right to self-defense to a nonfelonious initial aggressor so long as he had the option of running away, even if his retreat left him vulnerable to a deadly counterattack.

### B. *The prosecutor did not violate* Doyle

Delgado next argues that his privilege against self-incrimination was violated when the prosecutor argued to the jury that his post-*Miranda*,[12] pretrial silence could be used as evidence of his guilt. We disagree.

### 1. *Relevant factual background*

On the night of April 26, 2009, Sergeant Heather Randol of the San Jose Police Department stopped a vehicle driven by Ojeda. As a result of the vehicle stop, Randol and three other officers then went to Ojeda's apartment to perform a search. The officers arrived there at approximately 11:00 p.m. and found Delgado and Correa at the

_____

[12] *Miranda v. Arizona* (1966) 384 U.S. 436.

17

apartment.  Randol spoke to Delgado, but he identified himself to her as "Floyd Munoz," producing an identification card with that name on it.  At that time, none of the officers at the apartment knew that Delgado, Ojeda or Correa were suspects in Hazard's death.

On the following morning, April 27, Sergeant Randol discovered that "Floyd Munoz" was in fact Delgado and that he was a homicide suspect.  Detective Brian Spears of the San Jose Police Department, in company with other officers, went back to Ojeda's apartment and arrested Delgado along with Ojeda and Correa.  Delgado invoked his *Miranda* rights.

Following the close of evidence, the prosecutor argued that Delgado's presentation of false identification to Sergeant Randol demonstrated both his consciousness of guilt and his intent to kill:  "Finally, you have their fleeing, he lies to the police that night when [Sergeant] Randol came to Ralph Ojeda's apartment and Floyd Delgado gives her that ID with the fake name on it.  And you can't speculate as to how he got a real California ID.  I don't know.  That would be speculation.  It doesn't matter.  But he gives her an ID that doesn't have his real name on it.  That's what's important.  That shows his consciousness of guilt. [¶] None of them report to these officers that they've been attacked, just like they don't call the police and say, 'Hey, we were just attacked, and we had to act in self-defense.' "

Correa's counsel objected, claiming the prosecutor improperly commented on defendants' failure to protest their innocence to police in violation of *Doyle*.  The prosecutor explained her argument was addressing "the contact with [Sergeant] Randol and the other officers who went to do a parole search."  She further noted, "And I'm in the process of talking about what happened with the police *on the night before the arrests*, at which point none of these defendants were being contacted about any criminal activity at all, with the exception of maybe . . . Ojeda didn't have a license. . . .  And I'm talking about what happened that night."  (Italics added.)

18

Ojeda's counsel agreed that there was no *Doyle* error. Delgado's trial counsel, however, made no objection. Correa's counsel allowed that if the prosecutor was referencing only the officers' prearrest contact with the defendants he would not have raised an objection, but maintained the prosecutor's argument was unclear and the jury would not make that distinction. The trial court disagreed and found the argument did not violate *Doyle*.

2.     *No* Doyle *error*

*Doyle* held that a defendant's silence following the giving of *Miranda* warnings could not be used to impeach the defendant's explanation at trial. According to the United States Supreme Court, introducing evidence of a defendant's silence in such circumstances is fundamentally unfair and violates due process. As the court explained, "[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle*, *supra*, 426 U.S. at p. 618.)

A *Doyle* violation has two essential components, as follows: (1) the prosecution makes use of a defendant's postarrest silence for impeachment purposes, either during questioning or by reference during argument; and (2) the trial court permits that use. (*Greer v. Miller* (1987) 483 U.S. 756, 761-764.) "The type of permission specified in *Greer* will usually take the form of overruling a defense objection, thus conveying to the jury the unmistakable impression that what the prosecution is doing is legitimate." (*People v. Evans* (1994) 25 Cal.App.4th 358, 368.)

The Attorney General argues that Delgado also forfeited this claim by failing to object below. We agree.

Generally, the failure to object at trial waives a claim of prosecutorial misconduct on appeal because the trial court should be given the opportunity to cure any harm by

giving an appropriate instruction. (*People v. Green* (1980) 27 Cal.3d 1, 27; see, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 127 [failure to object to prosecutor's comment on defendant's failure to testify forfeited claim of *Griffin*[13] error on appeal].) Moreover, the potential prejudice to Delgado from the prosecutor's argument was not so great that it could not have been cured by an appropriate admonition. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1060.)

Although Correa's counsel objected to the alleged *Doyle* error, Delgado's trial counsel did not join that objection. (See *People v. Brown* (1980) 110 Cal.App.3d 24, 35 ["a defendant cannot take advantage of objections made by a codefendant in the absence of stipulation or understanding to that effect"].) Furthermore, a defendant's failure to object to *Doyle* error forfeits the issue on appeal. (*People v. Crandell* (1988) 46 Cal.3d 833, 879, fn. 14.)

Even if the argument were not forfeited, it is meritless. It is clear from the transcript that the prosecutor's argument referenced Delgado's silence on the night of April 26, 2009, when Sergeant Randol and the other officers encountered him at Ojeda's apartment, rather than his postarrest silence. It is permissible for a prosecutor to comment on a defendant's prearrest silence. (*Jenkins v. Anderson* (1980) 447 U.S. 231; *People v. Earp* (1999) 20 Cal.4th 826.) The California Supreme Court has specifically approved a prosecutor's questions about a defendant's prearrest failure to report a crime or contact police. (*People v. Tate* (2010) 49 Cal.4th 635, 691-692.)

III.    **DISPOSITION**

The judgment is affirmed.

---

[13] *Griffin v. California* (1965) 380 U.S. 609.

20

_____
Premo, J.

WE CONCUR:


_____
Rushing, P. J.



_____
Márquez, J.